# Exhibit A

```
Insured:      Royal Bahamian Association, Inc.
Claim No.:    5P19146W-L
Date of Loss: 10/24/2005
Policy No:    QF 2910-06
```

EXAMINATION UNDER OATH

OF

GINETTE LELIEVRE

2100 Ponce de Leon Boulevard

Penthouse

Coral Gables, Florida

October 26, 2009

Scheduled for 10:30 a.m.

Commencing at 10:34 a.m. to 3:10 p.m.

Page 2

1  APPEARANCES:
2      PATRICK A. BETAR, Esquire
       BERK, MERCHANT & SIMS, PLC
3      2100 Ponce de Leon Boulevard
       Penthouse I
4      Coral Gables, Florida 33134
       (786) 338-2900
5
       CHRISTOPHER MAMMEL, Esquire
6      CHILDRESS, DUFFY, GOLDBLATT
       515 N. State Street
7      Suite 2200
       Chicago, Illinois 60654
8      (312) 494-0200
9  ALSO PRESENT:
10     Chuck Dodd & Kathy Dodd, Adjusters
       QBE Insurance
11
                    - - -
12
13         INDEX OF EXAMINATION
14
15  EXAMINATION BY MR. BETAR.................... PAGE 4
16
17
18
19
20
21
22
23
24
25

Page 3

1         INDEX OF EXHIBITS
2        PAGE  NUMBER
3           1    57
            2    57
4           3    57
            4    66
5           5    75
            6    78
6           7    81
            8    81
7           9    83
           10    90
8          11    90
           12    92
9          13    94
           14    96
10         15   101
           16   104
11         17   109
           18   113
12         19   114
           20   117
13         21   117
           22   121
14         23   121
           24   121
15
16   (All exhibits were retained by Mr. Betar.)
17
18
19
20
21
22
23
24
25

Page 4

1       THEREUPON,
2            GINETTE LELIEVRE
3  was called as a witness and, having been duly sworn, was
4  examined and testified as follows:
5        THE WITNESS:  I do.
6           DIRECT EXAMINATION
7  BY MR. BETAR:
8      Q.  Could you just please state your name for the
9  record?
10     A.  Ginette Lelievre.
11     Q.  Ms. Lelievre?
12     A.  You can call me Ginette.
13     Q.  Ginette, we have asked you to come here as a
14  representative of the Royal Bahamian Condominium
15  Association for an examination under oath.  Is that your
16  understanding as to why you are here today?
17     A.  Yes.
18     Q.  Have you ever had your examination under oath
19  taken before?
20     A.  No.
21     Q.  Have you ever had a deposition?
22     A.  Yes.
23     Q.  Okay.  An examination under oath or EUO for
24  short is similar to a deposition in that I am going to
25  be asking you a series of questions about an insurance

Page 5

1  claim submitted by Royal Bahamian to QBE Insurance
2  Corporation regarding Hurricane Wilma.  I will be asking
3  you some questions about that, some questions about the
4  damages, the condition of the building before the
5  hurricane, the condition of the building after the
6  hurricane.
7        My name is Patrick Betar, and I am an attorney
8  with the law firm of Berk, Merchant & Sims and we
9  represent QBE Insurance Corporation with respect to this
10  matter.  You have been presented here today as the
11  person with the most knowledge of the claim and the
12  conditions of the building both before and after
13  Hurricane Wilma as well as the documents that have been
14  submitted in support of the claim.  I am going to ask
15  you to give me your knowledge as the representative of
16  Royal Bahamian in those areas.  If you don't know the
17  answer to the question, just say I don't know.  Don't
18  guess or assume or speculate.  I want to keep this as
19  accurate as possible.
20        If there is someone who has more knowledge
21  than you as to a certain area, feel free to say I don't
22  know and if there is someone else who would have more
23  knowledge, let me know so we know who would be a better
24  person maybe to speak to.
25        Understand, we are human and we may not have

Page 6

1   100 percent of information on every aspect.  Again, this
2   examination unlike a deposition which is taken pursuant
3   to rules of court, examination is taken pursuant to the
4   policy that was issued to Royal Bahamian.  I am going to
5   ask you to answer, however, as truthfully as you would
6   in a court of law.  You will recall before the
7   examination the court reporter swore you in to tell the
8   truth.
9        If I ask you a yes or no question, you have to
10  verbally say yes or no.  You can't shake your head and
11  say uh-huh or uh-uh that we do in normal speech because
12  the court reporter can't get that down and we won't know
13  what the response is down the road.  Also, I sometimes
14  have a problem with this.  We have to wait for each
15  other to finish speaking before we start speaking.  The
16  court reporter can only write down one of us at a time.
17  Again, just for accuracy, we will have to try and catch
18  each other if we cut each other off.
19       With regard to the EUO, this isn't an attempt
20  to trick or deceive you or the insured.  It's just a
21  mechanism for gathering information about certain
22  questions QBE has.  That being said, I caution you that
23  any false information could nullify coverage under the
24  policy.
25       If at any time you need to take a break,

Page 7

1   please let me know.  If you need to stretch your legs,
2   need the restroom or need a glass of water or if you are
3   getting tired and need to stretch, just let me know.  If
4   you don't understand a question I ask, ask me to repeat
5   it or rephrase it and I will try to do so.  Otherwise, I
6   will assume you understood the question and take your
7   answer accordingly.
8       A.  Okay.
9       Q.  Before we start -- and I see you have counsel
10  here today.  That is your right, although it's not
11  necessarily necessary to have him here.  Before we
12  start, and I assume your counsel has gone through the
13  process with you, I just want to ask you, do you have
14  any questions about the process of EUO before we start?
15      A.  No.
16      Q.  Could you please tell me how you know of Royal
17  Bahamian?
18      A.  I own a unit at Royal Bahamian.
19      Q.  What unit is that?
20      A.  510.  As a matter of fact, I own two units.  I
21  bought 506 recently.
22      Q.  When did you buy unit 506?
23      A.  I am so bad with dates, in May.
24      Q.  May of this year?
25      A.  May of this year.

Page 8

1       Q.  How long have you lived in unit 510?
2       A.  Since 2001, May of 2001.
3       Q.  Is that when you bought it?
4       A.  Yes.
5       Q.  Do you currently own any -- do you currently
6   hold any positions at Royal Bahamian?
7       A.  I am the president.
8       Q.  How long have you been the president?
9       A.  2008, March 2008.
10      Q.  How long is your term?
11      A.  I'm sorry?
12      Q.  How long is your term as president?
13      A.  It was for two years.  If I can just clarify
14  this, I was appointed by a unit owner, a board member
15  who resigned and I was appointed as a regular board
16  member.  Then came March, I think it's March 2008 I
17  became the president.
18      Q.  So your term as president would end in
19  March 2010?
20      A.  Correct.
21      Q.  Are all the officers -- first let me ask this
22  question.  Are there other officers besides the
23  president on the board?
24      A.  Yes.
25      Q.  Are they all elected in March every two years?

Page 9

1       A.  We were under scattered terms.
2       Q.  Okay.
3       A.  So if you ask me -- I will let you ask the
4   question.
5       Q.  Okay.  Are you still on scattered terms?
6       A.  Yes.
7       Q.  What other positions are on the board?
8       A.  We have a secretary, vice president and a
9   treasurer.
10      Q.  You mentioned you started with an appointment
11  as a regular board member?
12      A.  Director.
13      Q.  How many directors are there?
14      A.  There are seven board members so three other
15  directors.
16      Q.  You mentioned that the terms are staggered?
17      A.  The law allowed until this year to have a
18  staggered term, yeah.
19      Q.  Something changed this year?
20      A.  Yes.  Everybody -- unless the membership voted
21  to continue on the staggered term, every board member
22  has to serve for one year term.
23      Q.  One year term?
24      A.  It started January 10, 2010.
25      Q.  And in January, 2010, when that becomes

Page 10

1    effective, from that point on, will the entire board be
2    elected in mass, at once?
3        A.  The membership would have to vote.  Yes,
4    correct.
5        Q.  Okay.  These questions are just to get a basic
6    understanding of how the board is composed and what the
7    structure is?
8        A.  No problem.
9        Q.  What are your duties as president?
10       A.  Well, the main duty, of course, is to direct
11   and supervise our staff, the management staff and then
12   chair the meetings.  That's mainly it.
13       Q.  I am just going to go through each office.
14           Vice president, what are their duties?
15       A.  Assist the president.
16       Q.  Do they have any particular duties besides
17   assisting the president?
18       A.  Those are volunteer positions so the other
19   board members, they do what they can.  Some of them are,
20   you know, working.  Some of them are on-site, so they
21   take it upon themselves to help in their, what they can
22   do.
23       Q.  You mentioned that vice president is
24   voluntary.  Are all the positions voluntary?
25       A.  Yes.

Page 11

1        Q.  Including president?
2        A.  Mine too.
3        Q.  Lucky you.
4           Treasurer?
5        A.  I am surprised nobody wants to have the job.
6           MR. MAMMEL:  They get to have this kind of
7    fun.
8           THE WITNESS:  Everybody wished me luck today,
9    though.
10   BY MR. BETAR:
11       Q.  Because they don't want to have to come.  The
12   treasurer, I can guess what their duties are but would
13   you ---
14       A.  They oversee the finances.  They review the
15   monthly financials that are being prepared by the
16   finance manager.
17       Q.  The finance manager, is that with the
18   financial company?
19       A.  Affinity Management.
20       Q.  A-f-f-i-n-i-t-y?
21       A.  Correct.
22       Q.  Affinity is your property management company?
23       A.  They are the financial manager.
24       Q.  How long have they been the financial manager?
25       A.  I believe also since March of 2007, no, I'm

Page 12

1    sorry, 2008.
2        Q.  Did Royal Bahamian have a financial manager
3    prior to 2008?
4        A.  No.
5        Q.  Who would do the budgets then?
6        A.  They had an on-site manager working for the
7    association.  I have to rephrase this also.
8        Q.  Sure.
9        A.  They had hired another -- there was another
10   management company, Universal Management, and that
11   person was doing everything on-site.
12       Q.  How long was Universal there?
13       A.  I don't know exactly.
14       Q.  Were they there at the time of Hurricane
15   Wilma?
16       A.  Yes.
17       Q.  That was until 2008?
18       A.  Yes.
19       Q.  Well, is there a primary person responsible
20   for say the Royal Bahamian account at Affinity?
21       A.  Say that again.
22       Q.  Sure.  Is there a primary contact that Royal
23   Bahamian has with Affinity?
24       A.  Yes.
25       Q.  Who is that?

Page 13

1        A.  Pedro Garcia.
2        Q.  And that's been since March 2008?
3        A.  When we hired Affinity in 2008 they were
4    providing also a part-time manager, eight hours a week.
5        Q.  That's a property manager?
6        A.  As a property manager, yes.
7        Q.  Was that Pedro?
8        A.  No, that was Rafael Aquino.
9        Q.  How long did Mr. Aquino work there?
10       A.  Very briefly, less than a year.
11       Q.  Was his employment terminated or did he decide
12   to leave?
13       A.  No, we decided -- yeah, terminated in the
14   sense that ---
15       Q.  Why was he terminated?
16       A.  We felt that we needed a full-time manager and
17   he couldn't provide that to us at a price that we were
18   willing to pay.
19       Q.  Do you currently have a full-time property
20   manager?
21       A.  Yes.
22       Q.  Who is that?
23       A.  Adrian Paredes, P-a-r-e-d-e-s.
24       Q.  Is that Adrian i-e-n-n-e?
25       A.  A-d-r-i-a-n.

Page 14

1    Q.  Is that a Mr. or a Ms.?
2    A.  Mr.
3    Q.  Okay.  How long has he been -- how long has he
4  been the property manager?
5    A.  A couple of months.
6    Q.  Was there anybody before him?
7    A.  Yes.
8    Q.  Who was that?
9    A.  Her name was Michelle Smith.
10    Q.  Is she with any company?
11    A.  No, she was working for us.
12    Q.  Mr. Paredes?
13    A.  Paredes works for us also.
14    Q.  Do you know if there was a property manager
15  employed by Royal Bahamian at the time of Hurricane
16  Wilma?
17    A.  Yes.
18    Q.  Who was that?
19    A.  Gloria Diaz.
20    Q.  Was she with any company?
21    A.  Universal Management.
22    Q.  How long was she the property manager at Royal
23  Bahamian?
24    A.  I don't know exactly, a few years.
25    Q.  Okay.  Why is she no longer working with Royal

Page 15

1  Bahamian?
2    A.  When there was a new board and the board
3  wanted her terminated and her boss, Marta, M-a-r-t-a,
4  Bascoy, B-a-s-c-o-y, took over the on-site management.
5    Q.  When did that happen?
6    A.  I think it's in 2007, but I am not sure.
7  Around that time.
8    Q.  Approximately 2007?
9    A.  I'm sorry?
10    Q.  Approximately 2007?
11    A.  Yeah.
12    Q.  Do you know why the board no longer wanted
13  Ms. Diaz as the property manager?
14    A.  It was a new board member, a new board all
15  together so they just didn't feel comfortable with
16  Mrs. Diaz.
17    Q.  Did they give any reason why they didn't feel
18  comfortable with her?
19    A.  I don't know.
20    Q.  Did the new board come in on good terms with
21  the association?  How did they ---
22    A.  The previous board was recalled.
23    Q.  Do you know why they were recalled?
24    A.  A group of unit owners felt that they were not
25  doing what we were expecting them to do and they had

Page 16

1  been on the board for long enough.
2    Q.  Do you know the details of the reasons why
3  those unit owners felt the board wasn't doing what they
4  were supposed to?
5    A.  I have my personal opinion.  That doesn't mean
6  that was the opinion of the rest of the board members.
7    Q.  Did the group of unit owners ever state a
8  reason that you know of?
9    A.  Like I said, you know, they have been on the
10  board long enough.  They wanted to have a change.  They
11  felt that the board that was being recalled was too much
12  of dictatorship style.
13    Q.  When the new board came in they terminated
14  Ms. Diaz because they felt uncomfortable?
15    A.  Correct.
16    Q.  Is that because maybe Ms. Diaz --
17    A.  Her ties.
18    Q.  -- had ties with the old board?
19    A.  Yes.
20    Q.  Kind of jumping back on track, we were going
21  through the positions.
22        The secretary, what is the secretary's role?
23    A.  Just review the minutes and sign that it is
24  accurate as they remember it to be and review
25  correspondence that we receive.  Like I said, again,

Page 17

1  those are voluntary positions.  Not everybody is up to
2  the normal position.  They don't all have the skills to
3  fulfill entirely as per the book those positions.
4    Q.  Got you.  Do you need any water?
5    A.  No, thank you.
6    Q.  You are the current president, you mentioned?
7    A.  Correct.
8    Q.  Who is the current VP?
9    A.  John Moreno.
10    Q.  Is he a unit owner?
11    A.  He is a unit owner.
12    Q.  Do you have to be a unit owner to be on board
13  of Royal Bahamian?
14    A.  Yes.
15    Q.  Do you know what unit he owns?
16    A.  311 in the east building.
17    Q.  You just brought up a good point.  Your units,
18  which buildings are they in?
19    A.  In the west building, both of them.
20    Q.  Both are in the west.  How long has Mr. Moreno
21  been on the board?
22    A.  A long time.
23    Q.  Was he there during Hurricane Wilma?
24    A.  I am not sure.
25    Q.  Do you know how long he has been a resident at

Page 18

1    Royal Bahamian?
2        A.   As long as I was, as I am.  I am not sure,
3    sorry.
4        Q.   Who is the current treasurer?
5        A.   Nina Melamed.
6        Q.   Would you spell that?
7        A.   M-e-l-e-m-e-d, and her first name is Bernina,
8    but I think she has a more complicated first name.
9        Q.   How long has she been on the board?
10       A.   A few years also.
11       Q.   Do you know if she was there at the time of
12   Hurricane Wilma?
13       A.   She was a unit owner, yes.
14       Q.   What unit does she own?
15       A.   411 in the east building.
16       Q.   Was she on the board at the time of Hurricane
17   Wilma?
18       A.   I believe so, but, again, I am not sure.
19       Q.   Finally, the secretary, who is the current
20   secretary?
21       A.   His name is Pablo Vasconcelos.
22       Q.   V-a-s-c-o-n-c-e-l-o-s?
23       A.   Yes.
24       Q.   You see, the hard ones I can get.  The easy
25   ones I can't.

Page 19

1            How long has he been a secretary?
2        A.   Barely one year, maybe less.
3        Q.   How long has he owned a unit at Royal
4    Bahamian?
5        A.   His wife owns the unit.
6        Q.   Okay.  How long has he been a resident at
7    Royal Bahamian?
8        A.   Longer than me.  He became -- just to clarify
9    because I told you that you have to be a unit owner to
10   be on the board.  His wife recently added him to the
11   deed.
12       Q.   Okay.  Was she ever on the board?
13       A.   No.
14       Q.   There are three directors?
15       A.   Yes.
16       Q.   Who are the current three directors?
17       A.   Gustavo Turtula, T-u-r-t-u-l-a.
18       Q.   Okay.
19       A.   Ada Joseph.
20       Q.   Joseph?
21       A.   Joseph.  And Adrien, that's A-d-r-i-e-n
22   Predescu.  That's P-r-e-d-e-s-c-u.
23       Q.   Thank you.  How long have they been the
24   directors?
25       A.   Mrs. Joseph for years.

Page 20

1        Q.   Four years?
2        A.   No, many years.
3        Q.   Oh, for a long time?
4        A.   Mr. Turtula at least since 2007.
5        Q.   Okay.
6        A.   And Mr. Predescu recently also, maybe less
7    than a year.
8        Q.   Do the directors have any special
9    responsibilities other than being board members?
10       A.   No.
11       Q.   That may not have come out very clearly the
12   way I asked that.  As board members, do they have any
13   duties?
14       A.   Well, they have to participate in the
15   association's affairs.  They have to vote on projects
16   for approval and we are hoping that they volunteer also
17   their time with the resident.
18       Q.   So they are voting positions?
19       A.   Yes.
20       Q.   Does the association's board ever have -- most
21   associations call them board of directors meetings?
22       A.   Yes.
23           (Brief telephone interruption.)
24   BY MR. BETAR:
25       Q.   The board of director's meetings, who attend

Page 21

1    the board of director's meetings?
2            Let me rephrase that.  Can residents attend
3    the board of director's meetings?
4        A.   Yes.
5        Q.   Does the board ever have closed meetings?
6        A.   No, we are not allowed to.
7        Q.   What is the difference if there is a
8    difference between a board of director's meeting and a
9    general association meeting?
10       A.   There is two regulated membership meetings a
11   year, the budget and the election meeting where the
12   membership votes on the issues.  Otherwise, a regular
13   board meeting the membership doesn't vote.  They attend.
14       Q.   Okay.
15       A.   At the end of the meeting we have a good and
16   welfare where they can speak.  At the beginning under my
17   tenure, I added that the resident can make comments
18   within three minutes on the agenda items.
19       Q.   Prior to that change, were the residents able
20   to comment on the agenda items?
21       A.   I believe so, yes.  Not on the agenda item, on
22   anything they wanted to talk.
23       Q.   Now it's limited to the agenda item?
24       A.   Correct.  They can speak on anything else at
25   the good and welfare.

1    Q.  Just making sure I get this right, at the end
2  they can talk about anything pretty much?
3    A.  Yes.
4    Q.  As you are going through the agenda, they can
5  speak for up to three minutes about the issues being
6  discussed in the agenda?
7    A.  That's not how it is structured.  There is an
8  item on the agenda that says residents comment to the
9  board.  At that time they can discuss whatever is on the
10  agenda.
11    Q.  Okay.  You mentioned that the secretary would
12  review the minutes.  Are the minutes typed for the
13  meetings?
14    A.  Yes.
15    Q.  The secretary would do that?
16    A.  No, the manager would take the minutes and
17  transcribe them.
18    Q.  Are the meetings tape-recorded?
19    A.  No.
20    Q.  Have they ever been that you know of?
21    A.  Not on a regular basis.
22    Q.  Is there any reason why, that you know of,
23  certain meetings would be tape recorded and others would
24  not?
25    A.  Sometimes they were taped by a unit owner

1  or -- not by the board.
2    Q.  That was going to be my question.  The board
3  never had a policy where they would tape record the
4  meetings?
5    A.  No.
6    Q.  With regards to the minutes, they would be
7  transcribed and typed up by the property manager?
8    A.  Yes.
9    Q.  And then presented to the secretary for her to
10  review?
11    A.  They are presented at the following board
12  meeting.  Then we review them.  Sometimes we read them
13  and then we approve them as presented or we make
14  corrections.
15    Q.  After the corrections are made?
16    A.  Then the secretary signs off.
17    Q.  To your knowledge, have the minutes ever been
18  changed after the secretary has changed off of them?
19    A.  I don't recall.  I'm sorry, you mean after the
20  secretary signs off?
21    Q.  Yes.
22    A.  I don't believe so and I hope not.
23    Q.  That's the final edition?
24    A.  Yes.
25    Q.  The end all and be all.

1      Where are the minutes kept?
2    A.  In the office on site.
3    Q.  Do you know how far back the minutes that are
4  kept on site go back?
5    A.  The statute says seven years, so I don't know
6  how far back.
7    Q.  But at least until about 2001, 2002?
8    A.  Yes.
9    Q.  We will do a little shift to Hurricane Wilma,
10  the reason why we are all here.
11    A.  Yes.
12    Q.  Were you on the premises during Hurricane
13  Wilma?
14    A.  Yes, I was.
15    Q.  In your unit?
16    A.  In my unit.
17    Q.  Did you have any damage to your unit during
18  Hurricane Wilma?
19    A.  Yes, I did.
20    Q.  What damage did you have?
21    A.  Windows, screen doors, front -- both doors
22  frame damaged.
23    Q.  The front door had frame damage?
24    A.  Yes.  Balcony screen.  That's it.
25    Q.  Okay.  What type of damage did you have to

1  your windows?
2    A.  I had to replace -- I had to replace ---
3      (Brief telephone interruption.)
4  BY MR. BETAR:
5    Q.  We were talking about the damages to your
6  windows.
7    A.  Yes.  My bedroom window -- I have -- well, I
8  guess during the hurricane -- I don't know how to
9  explain it.  It was very scary anyway.  So, I can feel
10  that my window -- I was afraid that my window would just
11  get off the wall, but it did not.  Then the rain started
12  coming down my, you know, coming through inside of the
13  room next to the window sill.  I had wood floors.
14    Q.  How many bedrooms does your unit have?
15    A.  I have two.
16    Q.  Is that the master bedroom?
17    A.  That's the master.
18    Q.  I think you answered this, but did the window
19  blow out?
20    A.  No.  It did not, but after that I couldn't
21  open them and close them properly.
22    Q.  Did you report that to the board or
23  maintenance after the storm?
24    A.  Yes.
25    Q.  Who did you report it to?

Page 26

1    A.  To the office, to Gloria.
2    Q.  What was her response?
3    A.  Well, she was overwhelmed.  I reported it -- I
4  am a self-sufficient person, so I take care of my stuff.
5  So I reported it and, you know, told -- I reported it so
6  if they had any insurance, you know, that's supposed to
7  be taking care of that plus everything else that, the
8  damage that I received, I reported to them.
9    Q.  Okay.  At the time of Hurricane Wilma, do you
10  know if your windows were original to the building?
11    A.  Yes.
12    Q.  Do you know how old that would make them?
13    A.  Say that again.
14    Q.  At the time of Hurricane Wilma, were your
15  windows original to the building?
16    A.  Mine, yes.
17    Q.  How old were they?
18    A.  Well, depending.  It was 30 something years
19  old.
20    Q.  Have you ever had problems prior to Hurricane
21  Wilma with water coming in or out of the windows?
22    A.  No.
23    Q.  You have to wait for me to finish the question
24  because I know it but down the road I may not be here so
25  who knows what is going to happen.

Page 27

1       Did you replace your windows?
2    A.  Yes.
3    Q.  When did you replace them?
4    A.  In 2007.
5    Q.  Any reason why it was 2007 to replace them?
6    A.  The reason why?
7    Q.  Yes.
8    A.  Yes.  I have a reason because I wanted to
9  replace it with what I had or something similar but the
10  County was supposed to bring that up to code and they
11  said if you replace your window you need to install
12  shutters.  I didn't like the fact that I had to have
13  shutters on my master bedroom window so I replaced it
14  with high impact window so it took a little while.
15    Q.  Is that because you couldn't find anybody to
16  do it or it's just a matter of coordinating everything
17  together?
18    A.  Well, it was expensive and I needed a permit
19  and it was complicated.
20    Q.  Whose responsibility is it at Royal Bahamian
21  to fix damages to windows?
22       MR. MAMMEL:  Do you mean like is there a
23    maintenance person or are you asking a legal
24    question?
25

Page 28

1  BY MR. BETAR:
2    Q.  No, I am not asking a legal question.
3       Do you know if it is the unit owner's
4  responsibility to take care of the windows in your unit?
5    A.  Okay.  I think that's some type of legal
6  question also here and just because I am a property
7  manager, I know that if I got -- my window breaks for
8  whatever reason, a rock or bird or whatever, I am
9  responsible for it.  As far as casualty, you know,
10  it's ---
11    Q.  You were going to say?
12    A.  I would say if it's a casualty, that becomes
13  the association's responsibility but I am just -- this
14  is my opinion.
15    Q.  Okay.  Is that based on anything in
16  particular, your opinion?
17    A.  My opinion?
18    Q.  Yeah.
19    A.  No.
20    Q.  Fair enough.  Just to clarify, there is
21  nothing on the condominium documents that makes that
22  distinction?
23    A.  Between regular ---
24    Q.  Casualty.
25    A.  I don't think so.  I don't know.  I am not

Page 29

1  sure.
2    Q.  Okay.  Let me move onto the next damage you
3  mentioned was screen doors.  Where were the screen doors
4  located?
5    A.  In front of both entrance doors.  We have two
6  entrance doors.
7    Q.  The hallways that you used to access your
8  apartment at Royal Bahamian, are those exposed or are
9  they interior hallways?
10    A.  They are catwalks.
11    Q.  What happened to your screen doors during
12  Hurricane Wilma?
13    A.  One was gone.  It went to the temple across
14  the street and the other one I still have it but
15  damaged.  I repaired it the best I could.
16    Q.  Since then have you replaced the screen doors?
17    A.  No.
18    Q.  Any reason why you haven't replaced the screen
19  doors?
20    A.  No.
21    Q.  You mentioned there was some damage to your
22  front door --
23    A.  Yes.
24    Q.  -- from Hurricane Wilma.  What was that?
25    A.  The -- I am not an expert but the strength of

Page 30

1    the wind was -- the doors were moving.  One of them I
2    thought it would open but it did not.  But the frame,
3    you know, they were locked, of course, so they separated
4    from the frame.  What I call my front entrance door,
5    that one I cannot use anymore because if I open it I
6    cannot close it.  The kitchen door it's -- you know, the
7    wind, the air, the rain, everything comes in and also
8    the frame is separated from the door, the jam, the jam
9    is separated from the wall.
10       Q.  Have you made any repairs to your doors since
11   Hurricane Wilma?
12       A.  No.
13       Q.  No?
14       A.  No.
15       Q.  Any reason for that?
16       A.  Okay.  Let's clarify this.  I did not make --
17   I did not replace them, but I repaired them in the sense
18   that I can use them.  My front door, I don't open it
19   anymore and I put some weather strip and rags to just
20   keep it so there is no air coming in or water coming in.
21          The other doors I did not replace the
22   doorjamb, of course, but I made it -- I made some
23   adjustments so it can close properly.
24       Q.  Does rain and wind still come through the
25   kitchen door?

Page 31

1        A.  I'm sorry?
2        Q.  Does wind and rain still come through the
3    kitchen door?
4        A.  Still?
5        Q.  Yes.
6        A.  No.
7        Q.  How did you fix that or stop that from
8    happening?
9        A.  Well, maybe we got lucky also, the wind and
10   the rain didn't come that often on that side.
11          You know, yes, it did come back.  I think it
12   was last year during a big storm too, a rainstorm only,
13   not a hurricane.  The water came.
14       Q.  So water has come in when there was a big
15   storm?
16       A.  Yeah, rain, a rainstorm.  Yes.
17       Q.  If you have a normal rainstorm?
18       A.  No.
19       Q.  Okay.
20       A.  No, it's under a cover.
21       Q.  The other item you mentioned was the balcony
22   screen?
23       A.  Yes.
24       Q.  What happened with that?
25       A.  It was torn off also.

Page 32

1        Q.  The screen itself or the frame as well?
2        A.  No, just the screen.
3        Q.  Have you fixed that?
4        A.  Yes, I did, and I installed shutters.
5        Q.  Did you do that when you replaced the windows
6    or the window in the bedroom?
7        A.  Not the same company.  Maybe around the same
8    time, yes.
9        Q.  Let me ask it a little bit differently.  Do
10   you recall when you replaced the balcony screen or
11   repaired the balcony screen?
12       A.  If I recall when I replaced that?
13       Q.  Yeah.  Did you replace it or repair it?
14       A.  No, I repaired it.  I repaired that -- I think
15   Wilma was in October -- I think the following spring.
16       Q.  The spring of '06?
17       A.  Yes.
18       Q.  We are kind of starting from the specific and
19   now go to the more general because we talked about your
20   unit.  Now I want to talk about the building a little
21   bit.
22          After Hurricane Wilma, did you walk around the
23   building, do a walk through?
24       A.  Yes, I did.
25       Q.  What did you see?

Page 33

1        A.  A disaster.
2        Q.  Okay.
3        A.  Can you excuse me for a second?
4        Q.  Sure.
5        A.  I own another unit, 506.
6        Q.  Okay.
7        A.  It had damage also.
8        Q.  Okay.  I will come back to 506.  Thank you for
9    pointing that out for me.
10          When did you first, I guess, leave your
11   apartment and walk around Royal Bahamian?
12       A.  I don't remember exactly the time that
13   happened.  Like I said, I am a property manager and at
14   the time I was managing 11 properties.  I was a
15   portfolio manager, and I had to go visit my other
16   property also.  So, I am not sure exactly when I walked
17   our property, but I know that I couldn't use my car
18   because there was pieces of the roof that fell on top of
19   the trunk on top.  And there was another car next to me
20   also that there was big pieces of roof.  And I moved
21   those to get my car, but I realized I didn't have much
22   gas and we had no electricity.  And I didn't know for
23   how long.  So, I pulled out my bicycle and I went to
24   check my property riding my bicycle.
25          So, that same day, that's all I -- I took

Page 34

1   pictures of my car and things like that and then I went
2   on to visit my other property.
3       Q.  Do you still have those pictures?
4       A.  Yeah, I am sure I do.
5           MR. BETAR:  If you could -- I don't know if
6       they have been provided already.
7           MR. MAMMEL:  I am not sure either.  If not, we
8       will get them and I will provide them to you.
9   BY MR. BETAR:
10      Q.  Did you make a claim to your insurance company
11  for your car?
12      A.  No.
13      Q.  Was there any damage to your car?
14      A.  Just dents and stain, you know, but I took
15  care of that.  The dent my lease was expiring and I just
16  turned it over.
17      Q.  When you did walk around Royal Bahamian, what
18  did you see specifically?
19      A.  Of course, a lot of landscaping.  There was
20  two palm trees in the way, in the driveway.  Then a lot
21  of, like I said, roof debris on the parking lot, pieces
22  of air-conditioning, housing I imagine also in the
23  ground.  And I observed that by the west of the west
24  building that the roof had lifted off, all the flashing
25  or something was up.

Page 35

1           (Brief recess.)
2   BY MR. BETAR:
3       Q.  Did you take any pictures of what you
4   described as the west side of the west building's roof
5   being lifted up?
6       A.  I don't recall.
7       Q.  Do you know if anybody did from the
8   association?
9       A.  I don't know.  I reported it for sure but I
10  don't know.
11      Q.  Who did you report it to?
12      A.  To Gloria.
13      Q.  Again, if you do come across any pictures of
14  that if you can give it to your counsel I would
15  appreciate it.
16      A.  Yes.
17      Q.  What else did you remember seeing?
18      A.  Then a couple of days later again through what
19  I remember the dates or the dates with -- I went
20  up on the roof with Gloria.
21      Q.  Were you on the board at this time?
22      A.  I'm sorry?
23      Q.  Were you on the board at this time?
24      A.  No.  No.
25      Q.  What caused you to go on the roof with Gloria?

Page 36

1       A.  Because I wanted to help -- because I had
2   nothing to do and I wanted to help Gloria, you know.
3       Q.  At that time you were also a property manager
4   of other buildings you were saying?
5       A.  Yes.
6       Q.  Did they have any damage from the hurricanes?
7       A.  Yes.
8       Q.  This may seem like semantics but when you said
9   you had nothing to do at the time ---
10      A.  Sarcastic.
11      Q.  Sometimes sarcasm doesn't come out.
12      A.  Like I said, I was managing 11 properties but
13  I had no transportation except my bicycle.  I had a
14  property in Michigan Avenue and from North Miami Beach
15  it's a long ride.
16      Q.  Did Gloria ask you to help her with the
17  hurricane?
18      A.  I'm sorry?
19      Q.  Did Gloria ask you to help her after the
20  hurricane?
21      A.  If she asked me?
22      Q.  Yes.
23      A.  No.
24      Q.  You volunteered?
25      A.  Yes, as a unit owner.

Page 37

1       Q.  How long after the storm were you up on the
2   roof?
3       A.  That's what I cannot remember, a few days, I
4   imagine.
5       Q.  Did you go on top of the roof of both the east
6   and the west building?
7       A.  Just the west.
8       Q.  What did you see when you were up there?
9       A.  Well, first the door was blown open -- one of
10  the -- I don't remember if it was the east -- I think it
11  was the east.  We have three -- we have two access to
12  the roof.
13      Q.  Were you able to shut anything?
14      A.  I think I went from the east side.
15      Q.  Sorry, I didn't mean to interrupt.  Did you
16  try and shut the east door when you saw it was open?
17      A.  Yeah, we couldn't do it.
18      Q.  When you and Gloria were up there was there
19  anyone up there with you?
20      A.  At that moment, no.
21      Q.  Were either you or Gloria taking pictures?
22      A.  I don't remember if she had a camera or
23  something.  I was -- no, not me.  I didn't have a good
24  camera at that time so that's why I have to check the
25  pictures.  Now I have a digital but back then -- I don't

Page 38

1 remember if -- I am sure -- I don't remember if she took
2 pictures. I don't remember at this point we took
3 pictures. We were just evaluating, trying to put pieces
4 of air-conditioning where they belong.
5    Q.   What was wrong with the air-conditioners?
6    A.   A lot of housing were blown.
7    Q.   Were there any issues with the roof doors
8 prior to the hurricane?
9    A.   I don't think so. I don't know.
10    Q.   What about the air-conditioning units?
11    A.   No.
12    Q.   I know you didn't come on the board until last
13 year. When you got on the board, did you review the
14 minutes from prior years?
15    A.   To be honest, no.
16    Q.   Just to follow up to that, have you since
17 reviewed?
18    A.   Yes.
19    Q.   How far back have you reviewed the minutes?
20    A.   Almost all the way to 2005. Let me see.
21    Q.   Nothing before 2005? You haven't reviewed any
22 minutes before 2005?
23    A.   I would say yes, but don't ask me which year
24 exactly.
25    Q.   Fair enough. Were any of the windows at Royal

Page 39

1 Bahamian blown out?
2    A.   I don't know for sure. I heard about it
3 because the different layout of some of the units, like
4 the corner unit and the penthouse units, I believe that
5 there was but I am not -- there were, but I am not sure.
6    Q.   Do you remember seeing any as you were doing
7 your walk around?
8    A.   I have seen, yes, on the third floor, the
9 corner unit, I believe it must have been 301 and ---
10    Q.   Which building is that, the west?
11    A.   The west. Unfortunately maybe out of
12 selfishness, I live in the west building so I care a
13 little bit more about the west.
14    Q.   The unit on the third floor, you think it's
15 301, had a window blown out?
16    A.   Specifically blown out like taken out of the
17 frame or ---
18    Q.   Like the glass was broken or anything like
19 that?
20    A.   Yes, but not the frame out of the building.
21    Q.   Just the glass?
22    A.   Yes. And I remember some of my neighbors also
23 were saying that they couldn't close, just like mine,
24 couldn't close their windows after that, couldn't close
25 them shut.

Page 40

1    Q.   Do you know which neighbors those were?
2    A.   Well, I can say now 506 because I am very
3 familiar with that one.
4    Q.   That's the one you own?
5    A.   Right. Then 301 for sure. I believe they
6 were like upper -- it's 601. I cannot really give you
7 any more specific on that.
8    Q.   Do you remember the names of your neighbors
9 that were complaining they couldn't shut their windows?
10    A.   No.
11    Q.   What type of windows did Royal Bahamian have
12 at the time of Hurricane Wilma?
13    A.   You know, three pane, you know -- okay. Like
14 in my bedroom, I don't know the name. In my bedroom
15 it's three windows with three glasses that you crank
16 open.
17    Q.   You crank open?
18    A.   Yes, not the jalousies type.
19    Q.   Not jalousies type?
20    A.   No.
21    Q.   But a crank type?
22    A.   Right.
23    Q.   That type is uniform throughout both
24 buildings?
25    A.   For most, yeah. For most of it, yeah.

Page 41

1    Q.   And besides -- did you ever go on the east
2 building roof?
3    A.   I don't recall, no.
4    Q.   Do you know of any damages to the east
5 building's roof?
6    A.   I think so. The reason I am saying it is
7 because I heard at some of the meetings that I attended
8 after the hurricane.
9    Q.   Do you recall what you heard?
10    A.   I'm sorry?
11    Q.   Do you recall what you heard at these meetings
12 about the east roof?
13    A.   If I heard it?
14    Q.   Okay. Let me restate that. You just said
15 that you think there was damage to the east roof because
16 you heard ---
17    A.   Yeah, at the meeting some of the unit owners
18 complained that the -- it had to be somebody from the
19 penthouse and -- well, we had the same thing, too. We
20 couldn't drive by because in front of the east building
21 the driveway is very narrow and I think there was some
22 debris also from the roof coming from the roof that was
23 in the way.
24    Q.   But you never went on the east roof?
25    A.   No.

Page 42

1    Q.  Did you ever see any pictures of the east roof
2  from the hurricane?
3    A.  Not that I recall, no.
4    Q.  You don't know any specifics of any of the
5  damages that may have happened to the east roof during
6  Hurricane Wilma?
7    A.  Not really.
8    Q.  Is there anyone at Royal Bahamian who might
9  know more about the damages to the roof?
10   A.  I can't tell you who that would be.
11   Q.  Did Royal Bahamian have a maintenance man at
12  the time of Hurricane Wilma?
13   A.  We have janitors.
14   Q.  Do you have the same janitors now as the time
15  of Hurricane Wilma?
16   A.  No.
17   Q.  Any of them the same?
18   A.  Maybe one.
19   Q.  Who would that be?
20   A.  I'm sorry, at the time of the hurricane we
21  had -- I don't know if we had a maintenance person
22  part-time.  I am not sure if Roberto -- the only person
23  I can think that might have been there at the time of
24  the hurricane was Roberto, but I am not positive on that
25  either.

Page 43

1    Q.  Okay.  Do you know Roberto's last name?
2    A.  No.
3    Q.  Do you know if following the hurricane any
4  committees were formed by the association to deal
5  specifically with the hurricane?
6    A.  I don't know.
7    Q.  Specifically with Hurricane Wilma?
8    A.  I don't know.
9    Q.  Do you know about any of the other damages to
10  the east building from Hurricane Wilma?
11   A.  No, I don't.
12   Q.  Who would know about the damages being claimed
13  to the east building?
14   A.  I don't know.  I would imagine some of the
15  owners or the board members over there that live in the
16  east building.
17   Q.  Other than the damage to the unit you live in
18  that you spoke about and the second unit that we will
19  get to, I promise, what you recall seeing to the roof
20  and those couple of windows you believe you remember
21  being blown out with the west, do you recall any other
22  damages to the west building?
23   A.  Besides the roof, the air-conditioning?
24   Q.  Yes.
25   A.  Some of the windows, the roof doors, the

Page 44

1  landscaping, of course.  Oh, the parking lot lighting
2  was also ---
3    Q.  What happened to the parking lot lighting?
4    A.  We lost a lot of poles, fixtures.  Oh, and
5  also on the catwalks we had exit lights that indicate
6  the exits.  A lot of them were also blown away.
7    Q.  Have the lighting damages been repaired since
8  then?
9    A.  The lights, the light poles, no.
10   Q.  What about the ---
11   A.  We just made the absolutely necessary repair
12  to those.
13   Q.  Who did those repairs?
14   A.  I am not sure.  It might be Austin Electric
15  but I am not sure because he was the electrician at the
16  time.
17   Q.  Austin Electric is A-u-s-t-i-n?
18   A.  Yeah, A-u-s-t-i-n.  Yeah.
19   Q.  That's based in Miami-Dade County, as far as
20  you know?
21   A.  I believe so.
22   Q.  What about the catwalk exit lights, have those
23  been repaired?
24   A.  Yes.
25   Q.  Who did those repairs?

Page 45

1    A.  The same electrician, yes.
2    Q.  Were there any -- have there been any repairs
3  done to the roofs?
4    A.  Yes.
5    Q.  When did the association first start making
6  repairs to the roof?
7    A.  I am not too good at dates but I know that
8  Advanced just completed the east, the clubhouse and
9  completed the repairs on the west that Roman's
10  Waterproofing started.
11   Q.  When you say they just completed, can you give
12  me a timeframe when they finished?
13   A.  Maybe six months ago.
14   Q.  Okay.  Do you remember how much they charged
15  you for replacing the roof on the east building?
16   A.  I think it's close to 500,000.
17   Q.  That's just the east building?
18   A.  Yes.
19   Q.  What about the west building?
20   A.  Maybe a little bit more.
21   Q.  What about the clubhouse?
22   A.  A lot less, 80 something.
23   Q.  Do you know if the clubhouse is covered by the
24  QBE policy or if it's covered by another policy?
25   A.  That I remember receiving, Gloria showing me

1    the policy and it was covered by Citizens.
2        Q.  So is the clubhouse part of Royal Bahamian's
3    claim of Hurricane Wilma to QBE?
4        A.  I am not sure.
5        Q.  Who would know?
6        A.  I'm sorry?
7        Q.  Who would know that?
8        A.  I have to look at the documents.
9        Q.  Okay.  I will show you in a little while.
10           Have any of the windows been replaced or
11   repaired by the association since Hurricane Wilma?
12       A.  No.
13       Q.  Is there any reason for that?
14       A.  Well, I would say that the main reason is
15   because the association doesn't have the funds to do it
16   if we had to do it.
17       Q.  You say if we had to do it?
18       A.  Well, like I said, in case of casualty, I am
19   not sure it would be a legal decision to make.
20       Q.  Do you know if windows are part of the claim
21   that has been submitted to QBE?
22       A.  Yes.
23       Q.  They are part of the claim?
24       A.  Yes, they are.
25       Q.  But the association doesn't know if they are

1    covered by the association for insurance purposes?
2        A.  We don't know if it's -- could you repeat
3    that, please?
4        Q.  Sure.
5            Before you just testified that you weren't
6    sure if windows were the responsibility of the
7    association to replace after Hurricane Wilma.  Is that
8    correct?
9        A.  No, that's not what I meant.  I meant -- on a
10   normal basis a unit owner should be responsible for
11   their own windows.  In case of casualty, that's what I
12   said, it's something that I cannot give my opinion on
13   but after everything that we hear that, you know, from
14   the unit owners, we want to have our windows replaced
15   because we feel that we should be covered for that.
16       Q.  So, windows are part of the Hurricane Wilma
17   claim?
18       A.  Yes.
19       Q.  What about sliding glass doors?
20       A.  Yes.
21       Q.  Is that the same situation with the windows,
22   as far as who is responsible for replacing them on the
23   normal basis it would be the unit owners but you are not
24   sure under catastrophe situation?
25       A.  Correct.

1        Q.  I am not asking about any conversations you
2    had with counsel but have you retained counsel to look
3    into that issue as to responsibility legally for the
4    windows and sliding glass doors?
5        A.  No, we haven't.
6        Q.  Is there any reason why you haven't?
7        A.  Because we hired an expert to look into this
8    and we hired them to ---
9        Q.  Who is the expert that's looking into whether
10   or not the windows and sliders are part of the claim?
11       A.  Counsel from Childress.
12       Q.  So you do have attorneys looking into that
13   issue?
14       A.  Yes.
15       Q.  I am not trying to trick you, I promise.
16       A.  I understand.
17       Q.  You can answer this with a yes or no but do
18   you know if your counsel, Childress Duffy has come to a
19   conclusion as to whether or not the windows and sliders
20   are association property?
21       A.  I think so, yes.
22       Q.  Do you know what that conclusion is?
23       A.  That QBE is responsible.
24       Q.  So it's the association's position after
25   consulting with your counsel that windows and sliders

1    are, their repair are QBE's responsibility following
2    Hurricane Wilma?
3        A.  Yes.
4        Q.  Do you know when the association adopted that
5    position?
6        A.  Recently.  I would say back in July or August
7    of this year.
8        Q.  Do you know what that interpretation is based
9    on?
10       A.  No, I don't.
11       Q.  Do you know who would know why that change
12   happened or that -- excuse me.  Do you know who would
13   know the basis for that position?
14           MR. MAMMEL:  Other than her counsel.
15           MR. BETAR:  Other than your counsel.
16       A.  Our attorneys.
17   BY MR. BETAR:
18       Q.  Nobody from the board?
19       A.  No.
20       Q.  But you rely on the counsel to provide you
21   with that position?
22       A.  Yes.
23       Q.  Do you know who Elizabeth Zambrano is?
24       A.  Yes, I do.
25       Q.  It's Z-a-m-b-r-a-n-o.  Who is she?

Page 50

1    A.   She is a public adjuster hired by our previous
2  board president.
3    Q.   Who hired her?
4    A.   Say that again.
5    Q.   Who hired her?
6    A.   Gustavo Turtula.
7    Q.   Why did he hire her, if you know?
8    A.   I will assume that she was recommended to him
9  by our manager at the time, Marta.
10    Q.   But you don't know for certain?
11    A.   I don't know for sure.
12    Q.   Do you know what she was retained to do?
13    A.   To adjust the claim.
14    Q.   Did she do that?
15    A.   She started, yes.
16    Q.   It's your position she didn't finish?
17    A.   She didn't finish.
18    Q.   Why didn't she finish?
19    A.   I terminated her agreement.
20    Q.   When did you do that?
21    A.   Yes, I did.
22    Q.   When?
23    A.   Oh, when.  That was sometime in 2008.
24    Q.   Do you have a letter or anything terminating
25  her agreement?

Page 51

1    A.   Let's then clarify this.  I think she sent us
2  a letter telling us that she would no longer represent
3  us and we spoke about her agreement.  I had some concern
4  on the agreement itself and also on her competency or
5  skills of doing, you know, what was best for us.
6    Q.   What were your concerns regarding the
7  agreement?
8    A.   Well, the agreement was signed by Mr. Turtula
9  for a ten-percent retainer or ten percent, how do you
10  call that, fees.
11    Q.   Okay.
12    A.   But then the manager called me in the office
13  for me to sign because I believe I was the president at
14  the time to sign a new agreement that was supposed to
15  have been signed for 15 percent, and there was some
16  confusion as far as 15 percent of what or ten percent of
17  what.  So, when I refused to sign until I get more
18  clarification, then Mrs. Zambrano says, well, it doesn't
19  matter because she said that she already had a signed
20  agreement for the 15 percent.  I said, well, if you
21  think that you have it, then you bring it to me.  There
22  is nothing I can do if it was signed we will -- but she
23  never gave us that agreement and that's when she told us
24  that she would no longer represent us after that.
25    Q.   With regard to her incompetency, what concerns

Page 52

1  did you have?
2    A.   I'm sorry?
3    Q.   You said you were concerned also about her
4  competency.
5    A.   Well, because she wanted us, the association
6  to do for her what -- now I can see the difference
7  between her and Keys.  She wanted us to, you know, to
8  hire contractors, to do inspections and also she was
9  coming with some opinion that I didn't believe that were
10  correct.
11    Q.   Which opinions did you not believe were
12  correct?
13    A.   In reference to the damages.  I didn't think
14  that she was familiar with our policy and -- it was kind
15  of complicated, you know, with her and the volunteer
16  that we are and I was hoping that as our representative
17  that she would do the work for us and then give us
18  updates and reports.  But that was not the case.
19    Q.   What specifically with regard to the damages
20  in the policy did you not agree with her?
21    A.   Could you repeat that, please?
22    Q.   Sure.
23       You said you did not agree with her regarding
24  some of the damages and you don't believe she understood
25  the policy?

Page 53

1    A.   We had roof damages.  We had window damages
2  and I don't know, it was just -- to me it was
3  complicated.  I am not an expert.  Nobody were on the
4  board at the time and I didn't feel that she had the
5  experience and the contact also to evaluate our claim
6  properly.
7    Q.   We will go down the line early, but you
8  mentioned Mr. Keys.  Is that George Keys?
9    A.   George Keys.
10    Q.   You mentioned he hired some consultants or --
11  you said that Ms. Zambrano wasn't hiring consultants and
12  you can see the difference when Keys came in?
13    A.   No, I said after I met with Keys, I realized
14  that she was not -- we needed more than her.  I didn't
15  think that she had -- also, I never heard of that firm
16  adjuster also.
17    Q.   Freedom Adjusters?
18    A.   Freedom Adjusters, yeah.
19    Q.   Then you retained Mr. Keys?
20    A.   Yes.
21    Q.   When did you retain Mr. Keys?
22    A.   Sometime in June, May or June of 2008, 2008,
23  no, 2008, no, 2009.  Yeah, 2009.
24    Q.   2009?
25    A.   2009.

Page 54

1    Q.  How did you become familiar with Mr. Keys?
2    A.  From my work.
3    Q.  What, in specific, made you familiar with him
4  from your work?
5    A.  I'm sorry?
6    Q.  What specific from your work made you familiar
7  with Mr. Keys?
8    A.  I was there probably in 2008.
9    Q.  How did you come to meet him in 2008?
10    A.  Because they were hired by Ports View at the
11  Waterways.
12    Q.  Where is Ports View located?
13    A.  In Aventura.
14    Q.  What were they hired to do?  What was Mr. Keys
15  hired to do at Ports View?
16    A.  To adjust a claim also.
17    Q.  Jumping back to Royal Bahamian, what was
18  Mr. Keys -- what was he requested to do on behalf of
19  Royal Bahamian?
20    A.  Well, I asked him to -- we needed help over
21  there.  We needed help and more and more we were getting
22  complaints about the windows and so we really needed
23  experts and I felt that Keys will adjust the claim
24  properly and hire the experts to do that.
25    Q.  Did Mr. Keys hire experts to help?  Did

Page 55

1  Mr. Keys hire experts to help?
2    A.  Sure.
3    Q.  Who did he hire?
4    A.  Water glazing experts for the windows.
5    Q.  Who is that?
6    A.  T Glazing Consultants.  I don't know.  I don't
7  remember the name.
8    Q.  Does TSSA ring a bell?
9    A.  TSSA, correct.
10    Q.  What were they hired to do?
11    A.  To inspect all the windows.
12    Q.  Were they to give a general condition or were
13  they there to inspect just for Hurricane Wilma damage?
14    A.  Just for Hurricane Wilma, and if I may add,
15  that's exactly what Keys and their expert, they went in
16  every unit, which Freedom Adjuster had no plans neither
17  QBE to do at the time.
18    Q.  And Mr. Keys, was he hired to do a general
19  condition assessment of the building or just find
20  Hurricane Wilma damage or excuse me, just document
21  Hurricane Wilma damage?
22    A.  To document.
23    Q.  When did Mr. Keys do his inspections of the
24  buildings?
25    A.  Oh, it lasted a couple of days.  I believe we

Page 56

1  started in July.
2    Q.  Of this year?
3    A.  July of this year.
4    Q.  That's when TSSA was also there?
5    A.  Yes.
6    Q.  Do you know if anyone from QBE was invited to
7  go along with these inspection?
8    A.  I haven't seen, no.
9    Okay.  Your question was, were they invited?
10    Q.  Yeah or were they told this was going on, come
11  and look?
12    A.  Oh, I don't know.
13    Q.  Who would have contacted QBE about these
14  inspections?
15    A.  I would imagine our attorney or adjuster.
16    Q.  Do you know if Mr. Keys and his team came to
17  any conclusions about the windows and sliding glass
18  door?
19    A.  Well, yeah, they issued a report.  Yes.
20    Q.  I am going to show you two documents right
21  now.  I am going to mark three separate exhibits.  One
22  is titled Sworn Statement and Estimated Initial and
23  Partial Proof of Loss Building Damages Only.  I will let
24  your counsel look at that.  The second one is a Moye
25  Construction, Inc. estimate, created by Brian Moye that

Page 57

1  was submitted with the proof of loss and three is the
2  same but for, I believe, the west building and I will
3  mark those three.  Just if you can confirm which one is
4  west and which one is west.
5    A.  East and west.
6    MR. BETAR:  We will mark the east one as
7  Number 2 and the west one as Number 3.
8    (Exhibit No. 1, Sworn Statement, was marked
9  for identification.)
10    (Exhibit No. 2, Estimate East Building, was
11  marked for identification.)  One
12    (Exhibit No. 3, Estimate West Building, was
13  marked for identification.)
14  BY MR. BETAR:
15    Q.  The estimates we marked as 2 and 3, is this
16  what -- is this what Royal Bahamian is claiming was
17  damaged as a result of Hurricane Wilma?
18    A.  Yes.
19    Q.  Is that a yes?
20    A.  Yes.
21    Q.  Were those the ones created at the request of
22  Mr. Keys?
23    A.  Yes.
24    Q.  Mr. Keys was hired as an agent of Royal
25  Bahamian to create these estimates for Hurricane Wilma

Page 58

1   damage?
2        A.  Yes.
3        Q.  These estimates are what Royal Bahamian relied
4   on when they present their sworn statement and estimated
5   initial and partial proof of loss, building damages only
6   which were signed on September 15th, 2009?
7        A.  Yes.
8        Q.  I am just going to ask you to kind of identify
9   this for me.
10        Have you seen this Exhibit 1 before?
11        A.  Yes.
12        Q.  There is a handwriting at the bottom, a
13   signature.  Do you know whose handwriting that is?
14        A.  That's mine.
15        Q.  That's on the top line where it says insured?
16        A.  Yes, that's mine.
17        Q.  Who is below your signature?
18        A.  Mrs. Melamed.
19        Q.  Did you and Mrs. Melamed review these
20   estimates before signing?
21        A.  Yes.
22        Q.  Let me finish my question.  Did you and
23   Mrs. Melamed review the two estimates, two if three
24   before signing the proof of loss?
25        A.  Yes.

Page 59

1        Q.  And the association believes what is contained
2   in these are covered damages from Hurricane Wilma?
3        A.  Yes.
4        Q.  And you are submitting them to support your
5   claim for Hurricane Wilma?
6        A.  Correct.
7        Q.  And I guess I will start with the top and work
8   my way down on this.  It says Sworn Statement and
9   Estimated Initial and Partial Proof of Loss Building
10   Damages Only.  This was submitted on September 15th,
11   2009.  Is that correct or it was signed on
12   September 15th, 2009?
13        A.  Yes.
14        Q.  And Hurricane Wilma came across Florida on or
15   about October 24th, 2005?
16        A.  Correct.
17        Q.  Can you tell me what this means when it says
18   initial and partial proof loss?
19        A.  Well, I imagine that in the dictionary it
20   should say, initial that is the first one and partial,
21   that means it's not completely finished.
22        Q.  What four years after the hurricane does the
23   association need to do to complete this document?
24        A.  Say that again.
25        Q.  You said partial means it's not completed.

Page 60

1   What, now that we are four years after Hurricane Wilma,
2   does the association still need to do to complete its
3   claim to QBE?
4        A.  I would have to call the attorney and ask
5   them.
6        Q.  Do you know if there is any damages from
7   Hurricane Wilma that Royal Bahamian is claiming that are
8   not represented in these two estimates?
9        A.  As far as the building, where it says the
10   building damage only, I would think that that's it.  I
11   would think.  I am not sure.  I would think.
12        Q.  What else would you be claiming besides
13   building damage?
14        A.  The parking lighting, the whole issues.  I
15   didn't see that in here.
16        Q.  Do you know if there is an estimate or if
17   there is a claim for the parking fixtures?
18        A.  I don't know.
19        Q.  Does the association believe there is damage
20   to the parking structure from Hurricane Wilma?
21        A.  Yes.
22        Q.  But as of yet the association hasn't submitted
23   any claim for that?
24        A.  I am not sure that I reviewed the settlement
25   or the money that we received already from Citizens and

Page 61

1   I didn't think that they were all inclusive of that?
2        Q.  Okay.  Does QBE or does Citizens cover the
3   parking structure?
4        A.  It's not clear to me.
5        Q.  Okay.  Well, I guess what I am trying to find
6   out is we are now in 2009.  The hurricane was in 2005.
7   This says partial so to QBE they don't believe this is
8   your full claim because it does say partial.
9        Can you verify one way or another if the
10   amount claimed as stated on the proof of loss for
11   $8,475,190.75, if that is Royal Bahamian's complete
12   claim to QBE for Hurricane Wilma or if there are
13   additional items that still haven't been reported?
14        A.  Well, if it says partial, I have to rely on
15   our attorney to say that it is partial.
16        Q.  So I would have to speak with your attorney to
17   get that information?
18        A.  Yes.
19        Q.  Is there anyone at the association who can
20   confirm whether or not this document, which is titled a
21   partial proof of loss is, in fact, the complete claim
22   being submitted for Hurricane Wilma?
23        A.  I don't see who that could be.
24        Q.  So the only person who could answer that would
25   be your attorney?

1       A.  Correct.
2       Q.  Who would that be?
3       A.  (Pointing.)
4       Q.  You have to say his name.
5       A.  Mr. Mammel from Childress Duffy.
6       Q.  Sitting here today as the representative with
7   the most knowledge of the claim, do you know of any
8   other damages that are not, that Royal Bahamian
9   encountered during Hurricane Wilma that are not
10  represented by this document marked as Exhibit 1?
11      A.  Like I said, I believe that the parking
12  lighting and the clubhouse is not all.
13      Q.  But sitting here as the representative of
14  Royal Bahamian with the most knowledge of this claim,
15  you don't know why it's marked partial, specifically?
16      A.  No, I don't.
17      Q.  It's also marked estimated.  What does that
18  mean?
19      A.  Estimated is to me in my professional word
20  means that it's not the real cost.  It could be more.
21  It could be less, depending on the contractor that's
22  going to be hired to do the work.
23      Q.  So, seeing as this is titled both estimated
24  and partial, is the final number that eight million and
25  change the final claim that Royal Bahamian is submitting

1   to QBE for Hurricane Wilma damage?
2       A.  I missed something in your question.
3           (A portion of the record was read by the
4   reporter.)
5   BY MR. BETAR:
6       Q.  Do you need me to break that down?
7       A.  Yes.
8       Q.  We are in agreement that Document 1 in its
9   title it both says estimated and partial.  Correct?
10      A.  Correct.
11      Q.  And where it says the amount claimed and this
12  is for the Hurricane Wilma claim it says $8,475,190.75.
13  Correct?
14      A.  Correct.
15      Q.  Given that the Exhibit 1 says that it is
16  estimated and partial, I am asking you as the
17  representative from Royal Bahamian is this $8 million
18  figure the total claim for Hurricane Wilma damage that's
19  being submitted to QBE?
20      A.  At this moment, yes.
21      Q.  Do you know any reason why this number would
22  change in the future?
23          MR. MAMMEL:  Didn't she just explain that to
24  you?
25

1   BY MR. BETAR:
2       Q.  I am asking it this way because I don't think
3   I quite understood what she said.
4       A.  Okay.  This amount here represents these two
5   estimates.
6       Q.  Okay.
7       A.  You are asking me if I think that this is
8   final?
9           I am telling you that in here I don't see
10  anything for the lighting of the parking lot damage that
11  we received and also I am not sure if it contains all
12  the damage from the clubhouse.
13      Q.  Okay.  So, as of today Royal Bahamian has not
14  submitted its complete claim for Hurricane Wilma?
15      A.  Correct.
16          MR. BETAR:  Okay.  I think that was a very
17  roundabout way to getting to that.
18          MR. MAMMEL:  She is also indicating she is not
19  sure who covers the other items.  That's where the
20  confusion may be.
21          (A recess was taken from 12:03 p.m. to
22  12:07 p.m.)
23  BY MR. BETAR:
24      Q.  One other word I want to question you about.
25  It says initial.  Is this the first proof of loss that

1   was submitted by Royal Bahamian?
2       A.  I believe that Mrs. Zambrano had submitted one
3   also.
4       Q.  Okay.  So, when it says initial it doesn't
5   mean it's the first proof of loss ever submitted?
6       A.  Correct.
7       Q.  It means that there may be another one
8   following this one.  Would that be accurate?
9       A.  Yeah, that's what I had in mind.  Yeah.
10      Q.  The $8 million figure, that's the last set of
11  numbers, the 8,475 and change is that both for the east
12  and west building?
13      A.  Yes.
14      Q.  Okay.  So, this does represent both buildings
15  to this point?
16      A.  Yes.
17      Q.  I am just going to show you the other proof of
18  loss that we referenced before just to get you to
19  identify it.  I am going to show you a three-page
20  document that was sent by fax to Marta Bascoy, who was
21  your property manager at some point --
22      A.  Yes.
23      Q.  -- from Freedom Adjusters.  That's
24  Ms. Zambrano's company?
25      A.  Yes.

Page 66

1    Q.   The fax is dated September 6th, 2007.  It says
2    includes seven pages.  We only have three.  The Bates
3    labels are -- there are two sets of Bates labels.  I am
4    going to go by the upper right corner Bates labels
5    because there is less numbers.  That is RBA 008436
6    through -- well, no, they are not consecutive.  RBA
7    008437 and RBA 008443.  I am just going to ask you if
8    you have ever seen those documents before.
9        MR. MAMMEL:  You don't have a signed one?
10       MR. BETAR:  No.
11       MR. MAMMEL:  You just want to know if she has
12   ever seen it?
13       MR. BETAR:  Yes.
14       THE WITNESS:  I have seen it, yes.
15       (Exhibit No. 4, Fax Dated 09/06/07, was marked
16   for identification.)
17   BY MR. BETAR:
18       Q.   On this sworn statement and proof of loss
19   it's -- I note that it is unsigned.  It states that the
20   net amount claimed under the QBE policy is
21   $2,352,301.22.  I am just going to ask you to see if you
22   can confirm that for me.
23       A.   Yes.  Yes.
24       Q.   Do you know what changed between this
25   $2.3 million estimate and the $8.4 million estimate?

Page 67

1        MR. MAMMEL:  Just to be clear, that's not a
2    signed proof.
3    BY MR. BETAR:
4        Q.   Right.  That's why I am asking, what was not
5    represented by this first proof of loss that was not
6    signed that is represented in this signed one or is this
7    a draft copy, if you can just explain it, if you know.
8        A.   Well, that's exactly why we hired Keys because
9    after I reviewed this summary here, it's missing pages
10   that I have seen also.  That's what I said earlier that
11   I didn't feel comfortable with her numbers and the
12   estimate that she had based on contractors that came,
13   didn't even look inside of a unit so I didn't feel
14   comfortable with her numbers.
15       Q.   Okay.  So Royal Bahamian is not relying on
16   this document that's marked as Exhibit 4?
17       A.   No.
18       Q.   What contractors did Ms. Zambrano bring onto
19   the property?
20       A.   I don't recall the names, but I have seen some
21   papers at one time or maybe in correspondence or E-mails
22   that Mrs. Zambrano was bringing contractor or wanted us
23   to call contractors but I don't recall the names.
24       MR. BETAR:  Okay.  I think now is probably a
25   good time to break for lunch.  There are plenty of

Page 68

1    places that you can go.  I would ask that while you
2    are on the lunch break not to discuss the testimony
3    that you have given so far with your attorney and
4    we will come back and hopefully finish this up
5    quickly.
6        (A recess was taken from 12:13 p.m. to
7    1:20 p.m.)
8    BY MR. BETAR:
9        Q.   We have spoken about your knowledge regarding
10   damages to windows and sliding glass doors and the roofs
11   and the air-conditioners and some landscaping and the
12   exterior lighting.  I think I have touched on everything
13   we have touched upon.
14       Is there any other damages that Royal Bahamian
15   attributes to Hurricane Wilma that you can tell me
16   about?
17       A.   For the buildings?
18       Q.   Yes.
19       A.   I said the catwalks, the exit lights on the
20   catwalks.
21       Q.   Yes.
22       A.   The doors.  Oh, yeah, the sign at the
23   entrance, you know, the gatehouse.
24       Q.   What happened to the sign at the gatehouse?
25       A.   I think one of the side glasses, you know, the

Page 69

1    sign itself, not the whole post but one of the glasses
2    was broken.  I know it's been replaced but I don't know
3    when that happened, also the fences around the pool.
4    That was -- if I can remember, that was covered under
5    Citizens and the canopy of the clubhouse also.  We had
6    like awnings and the concrete fence above the wall
7    alongside the property that divide our property from the
8    school, from the temple.
9        Q.   With regards to the sign at the gatehouse, do
10   you know who repaired the sign?
11       A.   No.
12       Q.   You said the fencing around the pool was
13   covered under the Citizens policy?
14       A.   I believe so.  I am not sure, but I know that
15   was damaged.  You are asking me about damage.
16       Q.   Do you know if the canopy at the clubhouse was
17   under the Citizens policy?
18       A.   I am not sure.
19       Q.   And the concrete fence that divides the
20   property from I guess next door there is a temple and a
21   school.  Does that fence belong to Royal Bahamian or is
22   that ---
23       A.   Well, we found out after many years insuring
24   it that it belonged to the temple.  That's one of the
25   reasons that the board was recalled.

1    Q.   After Hurricane Wilma, did you do any -- did
2  Royal Bahamian do any repairs to that wall?
3    A.   We started until I got involved -- like I
4  said, I got involved a couple of years later and I
5  realized all these little boo-boos on the policy, but we
6  did very minor repairs to it.  We just tried to minimize
7  because those were concrete fences, you know, with
8  slates and we were afraid that it will fall and damage
9  more of the property.
10   Q.   Has the temple repaired the fence yet or the
11 wall?
12   A.   Recently they removed all of it and they put a
13 chain-link fence instead.  Our unit owners are not very
14 happy because they want them to replace the like but
15 they learned that it didn't belong to us.
16   Q.   Okay.  I am just going to go through a couple
17 of categories generically.  I don't know if they are
18 from your claim or not.  If they are, maybe it rings a
19 bell.  If they are not, then we will move on.
20        Do you know if there was any damage to the,
21 let's say the interiors of the buildings from Hurricane
22 Wilma?
23   A.   Inside of units, sure, yes.
24   Q.   Inside of units.  Okay.
25   A.   And the clubhouse, too.

1    Q.   What type of damages were there inside the
2  units?
3    A.   You know, water intrusion from windows,
4  from -- I don't know if I can open a parenthesis here
5  but just because we know that buildings structurally
6  they move a little bit and I understand that during
7  Wilma, I mean, during a storm that the pressure, you
8  know, the wind pressure so the ceiling fans would move
9  even if there is no electricity.  But I was scared with
10 my shower.  I was getting nervous and I went in my bed.
11 I really felt the building, my bed was, you know,
12 moving.  So, that's what I am saying.  So, that's why I
13 don't have any doubts that all these, you know, damages.
14 So, from the unit, yeah, water intrusion and the
15 clubhouse also from the sliding glass door and from the
16 roofs.
17   Q.   You said you could feel your unit moving from
18 the storm.  Were there any cracks in your walls?
19   A.   In my kitchen.  Not really major cracks but
20 yeah, I could see because underneath my window sill
21 after that, you know, I can see that there was water
22 coming in and outside there is like cracks.  I am not a
23 structural engineer.  I know it might not be structural
24 but, yes, there is cracks.
25   Q.   The cracks are on the outside?

1    A.   On the outside and then I guess the water
2  penetrates eventually.
3    Q.   In the stucco?
4    A.   Yes.
5    Q.   Do you know if there were any issues with
6  cracking stucco at the Royal Bahamian prior to the
7  hurricane?
8    A.   No.
9    Q.   No, you don't know or no there were not?
10   A.   I am pretty sure there were not.
11   Q.   Was there any damage to Royal Bahamian
12 following Hurricane Katrina?
13   A.   Katrina, no.
14   Q.   No damage?
15   A.   Katrina -- I don't think Katrina hit us, did
16 it?  No.
17   Q.   I know you just got elected into the board in
18 2008 but you have been a resident since 2001 I believe
19 you said.
20   A.   Yes.
21   Q.   Did you go to the meetings prior to being
22 elected?
23   A.   Sometimes when I had nothing to do.
24   Q.   About how frequently would you go to the
25 meetings?

1    A.   Okay.  First of all, from 2001 to probably
2  2005 when I started a little bit getting more involved,
3  the current -- that president at the time was not
4  holding regular meetings.
5    Q.   In 2002?
6    A.   2002, 2003, 2004.
7    Q.   When did they start holding regular meetings?
8    A.   I'm sorry?
9    Q.   When did the association start holding regular
10 meetings?
11   A.   Well, what I want to say is that, you know,
12 when I became president of the board, I put a schedule
13 of meetings.  Every third Tuesday of the month there
14 would be a meeting.  Before that there was no such a
15 thing as regular board meetings scheduled.
16   Q.   Before this the board would meet?
17   A.   Whenever they had something that they really
18 wanted us to know about.
19   Q.   Before you had testified that on your lawyer's
20 advice that the association believes the windows and
21 sliding glass doors are the responsibility of the
22 insurance company in a catastrophe like a storm for
23 repair and replacement.  Is that correct?
24   A.   Could you rephrase that?
25   Q.   Sure.  I may have lost myself on that one.

Page 74

1  Previously we were talking responsibility for repairing
2  windows and sliding glass doors.
3      A.  Right.
4      Q.  You had mentioned that based on your
5  attorney's advice the board now believes that the
6  damages to windows and sliding glass doors as a result
7  of a catastrophe are a responsibility of QBE?
8      A.  I think they should be covered by our policy,
9  yes.
10     Q.  Do you know when the board adopted that
11 interpretation?  Has it always been that the board
12 believed -- let me rephrase that.
13         Has it always been that the board believed
14 from a catastrophe type storm that windows and sliding
15 glass doors during a catastrophe were the insurance
16 association's responsibility?
17     A.  Again, you know, that leads to our document
18 interpretation and legal also issue.  I know it was
19 discussed at meetings, how come the association doesn't
20 fix those windows, that should be covered by our policy.
21 So, definitely the unit owner really believed that we
22 should have been insured for this and that the insurance
23 company should pay for that, but as far as having a
24 motion at a board meeting to establish that, that did
25 not happen.

Page 75

1      Q.  Okay.  I guess my question is more, when did
2  the board accept that windows and sliding glass doors
3  during a catastrophe were the association's
4  responsibility?
5      A.  When we hired Childress, our attorney and
6  reviewed the documents then we led to that legal
7  opinion.
8      Q.  Do you know about when that was, month, year?
9      A.  That will be close to May of 2009.
10     Q.  I am going to show you a document that I am
11 marking as Exhibit 5.  It's two pages and the Bates
12 label on the upper right hand corner are RBA 030146 and
13 RBA 030147.  It says special bulletin regarding
14 Hurricane Wilma damage.  Have you ever seen this
15 document before?
16         (Exhibit No. 5, Special Bulletin, was marked
17 for identification.)
18     A.  You know what, no.  I have never seen that.
19 BY MR. BETAR:
20     Q.  Have you ever seen a document entitled special
21 bulletin ever issued by the board before?
22     A.  There is no date or not this.  I'm sorry.  Ask
23 your question.
24     Q.  Have you ever seen a document similar to this
25 before?  Do you know what that is?

Page 76

1      A.  Okay.
2      Q.  Has the board or the management company ever
3  issued a document such as that special bulletin or
4  notice to unit owners?
5      A.  I don't recall.
6      Q.  Okay.  Can I just have that back for a second.
7  This document entitled Special Bulletin regarding
8  Hurricane Wilma damage, it says on it that and I will
9  read it slow, "All maintenance, repairs and replacements
10 performed in or to any unit, including the limited
11 common elements, appurtenant thereto, whether structural
12 or nonstructural, ordinary or extraordinary, shall be
13 performed at the unit owner's sole cost and expense.
14 Such maintenance, repairs and replacements shall
15 include, without limitation, maintenance, repair and
16 replacement of screens, (including screens of screen
17 enclosures) windows, sliding glass doors, access doors,
18 plumbing and electrical fixtures and outlets," etcetera.
19 And that is the third paragraph on the page and it is in
20 regard to Hurricane Wilma damage as the document states
21 and the second page of it has a page from your bylaws.
22         Do you recognize these as coming from your
23 bylaws?
24     A.  Yes.
25     Q.  And it says, and that quotation comes straight

Page 77

1  out of the bylaws from the condo documents.  You don't
2  recall ever getting this?
3      A.  No.
4      Q.  The portion of the condo docs that say that it
5  is the unit owner, that repairs and replacements shall
6  be performed at the unit owner's sole cost and expense
7  without limitation to windows and sliding glass doors,
8  has that portion of the bylaws ever been amended since
9  2005?
10     A.  Amended?
11         Okay.  What I can say here is that that's --
12 it's signed management.  I guess it's an opinion from
13 management which -- I still feel, you know, that this is
14 a legal issue because I know that it's been all over
15 South Florida and, yes, our documents state and I guess
16 that anybody can look at the document and cannot deny it
17 is in our document but, again, it becomes a legal issue
18 as far as it being a casualty.  But it's not for me to
19 decide.
20     Q.  Do you know if anywhere in the condo docs it
21 states that for catastrophe the association is
22 responsible for windows and sliding glass doors?
23     A.  I don't recall seeing that in the documents,
24 no.
25     Q.  Also, what I am going to mark as Exhibit 6 are

Page 78

1  minutes for the board of directors for Royal Bahamian
2  Condominium Association held on May 9th, 2006, at
3  7:30 p.m. They are signed -- I will have you identify
4  the signature but do you recognize these as being
5  minutes from Royal Bahamian?
6       (Exhibit No. 6, Meeting Minutes 5/9/06, was
7  marked for identification.)
8       A. I need to read this.
9       Q. Okay. Take your time.
10      A. Yeah, I recall briefly. Yes, I read those
11  minutes, yeah.
12      Q. Those are minutes from Royal Bahamian?
13      A. Yes.
14      Q. For the record they are Bates labeled in the
15  upper right hand corner RBA 015321 through RBA 015328.
16  I am going to point you to the second page of Exhibit 6
17  and the second paragraph, bulleted paragraph, where it
18  says, "Windows repairs/replacement. Board motion to
19  have manager to send a letter advising unit owners that
20  they have to have their windows repaired or under
21  contract to replace within 30 days of receipt of the
22  letter. Motion made by Armando Andreu, A-n-d-r-e-u,
23  seconded by Marilyn Mace. Unanimous motion passed. In
24  addition, place a notice advising unit owners that any
25  debris coming from their units must be removed from the

Page 79

1  premises by either the unit owner and/or a contractor
2  performing the work."
3       Why in May 2006 was the board advising the
4  unit owners that they had to repair or replace their
5  windows within 30 days?
6       A. Like I said before, because the manager didn't
7  have any resources to -- that's how the fight started
8  among the unit owners and board members. We didn't feel
9  that was right and that's why they were recalled. They
10  weren't making any efforts to follow the insurance
11  policy, to contact -- I think that Mr. Dodd had come
12  immediately after the hurricane. This is something that
13  I heard over the years and just stated that there was no
14  damage, nothing was covered so hi and bye. That's how,
15  you know, all the unit owners were very upset that
16  nothing was really -- from what I heard, we didn't have
17  the expertise to decide things like that and the manager
18  took it upon herself and now I can see -- if I didn't
19  see the notice, it was probably not distributed to the
20  unit owners but simply posted.
21      Q. That wasn't my question, really. But you
22  actually gave me more detail than what the question was
23  asking for. My question was why was the board
24  instructing the unit owners to -- why did the windows
25  have to be repaired or replaced within 30 days?

Page 80

1       A. I don't know why they were saying that.
2       Q. Was it because they were damaged or because
3  they wanted to get new windows?
4       A. No, because they were damaged. People were
5  complaining they were damaged, yeah.
6       Q. You believe that this bulleted paragraph
7  correlates with this special bulletin?
8       A. I would assume that but ---
9       Q. Again, you don't know anywhere in the condo
10  documents where it places the responsibility of
11  replacing the windows on the association?
12      A. On the documents, no.
13      Q. Okay. I just want to show you, just for
14  identification purposes -- I am not going to make you
15  read through the whole thing -- what I am going to mark
16  as Exhibits 7 and 8. Document 7 is entitled Certificate
17  of Amended and Restated Declaration of Condominium of
18  Royal Bahamian East Condominium and it's dated the 15th
19  day of December, 1989. And Document 8 is titled
20  Certificate of Amended and Restated Bylaws of Royal
21  Bahamian Association, Inc. dated the 15th of December,
22  1989. I am going to ask you to take a look at them and
23  confirm whether or not these were the condo documents,
24  the controlling condo documents at the time of Hurricane
25  Wilma.

Page 81

1       (Exhibit No. 7, Condo Docs, was marked for
2  identification.)
3       (Exhibit No. 8, Condo Docs, was marked for
4  identification.)
5       A. The question is, are they the condo docs for
6  Royal Bahamian?
7  BY MR. BETAR:
8       Q. Yes, that were in effect at the time of
9  Hurricane Wilma?
10      A. Yes.
11      Q. Are they the current condo docs?
12      A. I believe that there was a couple of
13  amendments after this.
14      Q. Do you know when those amendments were made?
15      A. I don't recall. Let me just find something
16  and then I will tell you if ---
17      Q. Sure.
18      A. You are referring just at the time of Wilma
19  because we passed a couple of amendments recently?
20      Q. Two questions. One, are those the condo docs
21  at the time of Wilma, and, two, are they the current
22  condo docs?
23      A. Okay. So they are not the current condo docs.
24      Q. But they were the ones at the time of
25  Hurricane Wilma?

Page 82

1       A.  Yes.
2       Q.  Is it possible for you through your attorneys
3   to send us the amendment?
4       A.  It's just a couple of pages.  Everything else
5   is the same except we have the amendment one or two
6   pages.
7       MR. BETAR:  You don't have any objection to
8       providing that?
9       MR. MAMMEL:  No, we will get the most current.
10      THE WITNESS:  It's an amendment to pets and to
11      rentals.  They haven't been recorded yet, and you
12      know, also, by law that children are allowed now.
13  BY MR. BETAR:
14      Q.  Okay.  Yeah.
15          Prior to Hurricane Wilma, had there been
16  problems with the windows and sliding glass doors at
17  Royal Bahamian?
18      A.  Not that I know of.
19      Q.  I believe you testified before you didn't have
20  any problems with your windows or sliding glass doors
21  what was in your apartment?
22      A.  No, definitely not.
23      Q.  You haven't heard of any problems with windows
24  or sliding glass doors prior to Hurricane Wilma?
25      A.  No.

Page 83

1       Q.  I am going to show you what I am going to mark
2   as Exhibit 9, which is Royal Bahamian Condominium, Inc.,
3   Board of Directors Meeting, January 20th, 2005, at 7:30,
4   Bates labeled RBA 021896 through 021900.  I am just
5   going to ask you to identify if they are minutes from
6   Royal Bahamian.
7       A.  It's a different format.
8           (Exhibit No. 9, Meeting Minutes 01/20/05, was
9   marked for identification.)
10  BY MR. BETAR:
11      Q.  Okay.  Let me see if it's the same one I am
12  looking at now.  On the first page, under agenda at the
13  bottom, bullet number four says replacement of doors to
14  units.  This was on January 20th, 2005, you were talking
15  about replacing the unit doors.  Do you know what they
16  are referring to?
17      A.  Yeah.  When was it, in January of '05?
18          I remember going to a board meeting.  I don't
19  think it was that one because there are a few things I
20  don't recall on that.  The unit owner wanted to replace
21  the unit doors to put like a little, you know, to change
22  the door with a door with the little window on top.
23  That I remember.  Also, I think a couple of unit owners
24  had took it upon themselves to change their doors and
25  they had them installed the wrong way, opening outward

Page 84

1   instead of -- I remember that was discussed at the
2   meeting and replacement of the unit doors was --
3       Q.  The unit owner's responsibility?
4       A.  -- the unit owner's, yes.
5       Q.  On the second page, kind of the first block
6   kind of halfway through starting with Ada discussed.  It
7   says, "Ada discussed that the buildings need to be
8   painted again.  The paint company that previously did
9   the job, but did a bad job, this board inherited the
10  problem with the paint job from the board present during
11  period."  What bad painting job are they talking?
12      A.  I don't know because I bought in 2001 and the
13  building had been painted.
14      Q.  This is in 2005?
15      A.  I know.  So, I don't know when that was
16  painted before that.
17      Q.  But in January of 2005 the building needed to
18  be painted again, according to these minutes?
19      A.  Yeah, I guess so.
20      Q.  Do you know why it needed to be painted again?
21      A.  Well, it says that the company that previously
22  did the job did a bad job so maybe -- I don't know.
23      Q.  Do you know any?
24      A.  The building looked good to me when I
25  purchased the apartment.

Page 85

1       Q.  It did or did not?
2       A.  It did.
3       Q.  Do you know any of the specifics about this
4   discussion about repainting the building from January
5   of 2005?
6       A.  2005, no.  No.
7       Q.  Okay.  If you will turn the page and turn it
8   again to the Bates label RBA 021899.
9           Again, on January 20th, 2005, the first
10  bullet, "When will the fence be fixed?  Answer, by next
11  week."  Do we know which fence we are talking?
12      A.  I don't know which fence and I don't know
13  which week.
14      Q.  Okay.  Going down to the third bullet on that
15  page it says, "The unit windows are over 36 years old.
16  The gaskets are rotted and the seals are no longer made.
17  The water is going through the windows.  We have checked
18  and the windows are the owner's responsibility."  Do you
19  know if between January 2005 and October 2005 the rotted
20  gaskets and seals were replaced on the windows?
21      A.  No, I don't.
22      Q.  Would replacing the gasket and the rotted
23  seals be the unit owner's responsibility or the
24  associations?
25      A.  The gasket is the unit owner's.

Page 86

1    Q.  As well as the seal, replacing the seal?
2    A.  The window sill?
3    Q.  Seal, s-e-a-l?
4    A.  No.  How can we do this from inside, no.
5    Q.  So, that's the unit owner's responsibility?
6    A.  No.  From the outside, no.
7    Q.  It says, "The gaskets are rotted and the seals
8  are no longer made.  The water is going through the
9  windows.  We have checked and the windows are the unit
10 owner's responsibility."  Are the seals part of the
11 window?
12   A.  We are talking about the seals meaning
13 caulking from the outside?
14   Q.  Whichever seals were rotted and allowing water
15 to flow into the units in January of 2005?
16   A.  I have no idea.  There is a gasket on the
17 window in the bottom that's like a water strip.
18   Q.  Okay.  So at least as far as the minutes seem
19 to portray ---
20   A.  This is written by somebody that doesn't have
21 knowledge of much.
22   Q.  Well, I read the condo documents and it says
23 the windows are part of the unit owner's responsibility,
24 is that correct, according to the condo doc?
25   A.  That's correct.

Page 87

1        MR. MAMMEL:  That's just the interpretation of
2    one of the provisions of the contract.  Right?
3  BY MR. BETAR:
4    Q.  Well, let me read that provision again.
5        When it says that all maintenance, repairs and
6  replacements performed in or to any unit, including the
7  limited common element appurtenant thereto, whether
8  structural or nonstructural, ordinary or extraordinary,
9  shall be performed by the unit owner's sole cost and
10 expense.  Such maintenance, repairs and replacements
11 shall include without limitations, maintenance, repair
12 and replacement of screens, including screens and screen
13 enclosures, windows, sliding glass doors.
14       So, pursuant to that, would you agree with me
15 that the condo documents read that all maintenance
16 repairs and replacements to any unit shall be the owner
17 or units, shall be performed at the unit owner's sole
18 cost and expense and such maintenance repairs and
19 replacements shall include without limitation, windows
20 and sliding glass doors.
21       MR. MAMMEL:  For the record, that says what it
22   says, obviously.  That's an excerpt from a condo
23   document, and you are asking here ---
24       MR. BETAR:  Is that what it is?
25   A.  That's what I read.

Page 88

1  BY MR. BETAR:
2    Q.  According to all the board minutes that we've
3  looked at prior to involvement of counsel, the board
4  appears to have interpreted that as the windows being
5  the unit owner's responsibility.  Is that correct?
6    A.  Per the documents without any legal
7  interpretation, yes.
8    Q.  Okay.  So, according to this minute that we
9  are looking at that's Bates labeled RBA 021899, the
10 rotted seals and gaskets that are allowing water to come
11 into the windows as of January of 2005 were the unit
12 owner's responsibility pursuant to this document?
13       MR. MAMMEL:  You are just asking whether
14   that's the position the board took?
15       MR. BETAR:  Yes, based on the condo documents.
16   A.  Well, again, if you are asking me if replacing
17 the gasket under normal circumstances -- like it says
18 here, the windows were 36 years old.  So, you have to
19 maintain your window and that's the unit owner's
20 responsibility as far as maintaining them.  As far as
21 anything else being done from the outside towards the
22 building, I mentioned that's the same thing when the
23 building gets painted or concrete restored, they don't
24 skip windows.  They do everything and it's the same
25 process.

Page 89

1    Q.  If the seal is part of the window, would that
2  be the unit owner's responsibility to maintain?
3    A.  It depends.  I would not put it like that.
4    Q.  But it seems that the board, at least in
5  January 2005, was interpreting it that way from this
6  document?
7    A.  Yes, and boards are not experts in ---
8    Q.  Those are the documents they are reading?
9    A.  I can see this is also written also there.
10   Q.  Again, you can't show me anywhere in the condo
11 documents where maintenance, repair or replacement of
12 the windows is the unit owner's responsibility?
13       MR. MAMMEL:  Do you mean as a matter of legal
14   interpretation?
15 BY MR. BETAR:
16   Q.  No.  You can't show me any words in the condo
17 documents that say repair, maintenance and replacement
18 of windows is the association's responsibility?
19   A.  I cannot, no.
20   Q.  You also mentioned prior that 301 had some
21 damage from Hurricane Wilma?
22   A.  Yes, in the west building.
23   Q.  Right underneath the paragraph we just read it
24 says 301 west stated that he had a leak in his wall.  We
25 checked that for correction.  I haven't been able to

Page 90

1  find any document that it was ever checked out or
2  repaired. It's not to say it's not in there. There are
3  a lot of documents. Do you know if that leak was ever
4  fixed?
5       A. I know for a fact that 301 West, I don't know
6  if that's the same unit owner. Yes. It has to be.
7  They had a leak on the wall but not from the glass that
8  I saw. 301 is a wraparound and it was not from the same
9  area.
10      Q. Okay. I am going to show you a document I am
11 marking as Exhibit 10, which looks to be exactly what we
12 were looking at in Exhibit 9 except for it has a
13 different format, different layout, different font. I
14 am just going to ask you to take a look at it and see if
15 you can explain.
16      A. The same minutes, the same date.
17      Q. But it's a completely different layout. I
18 have another page I am going to mark as Exhibit Number
19 11 that belongs with Exhibit 10 which is also found in
20 Exhibit 9.
21          (Exhibit No. 10, Meeting Minutes, was marked
22 for identification.)
23          (Exhibit No. 11, Meeting Minutes, was marked
24 for identification.)
25

Page 91

1  BY MR. BETAR:
2       Q. Do you know how this came about?
3       A. I know that this is horrible. Are you asking
4  me to make sure that what is here is the same?
5       Q. Whether the information is the same. Take
6  your time.
7       A. Okay.
8       Q. Maybe it's that one is the draft and the other
9  one is the final version.
10      A. It could be, yeah. Okay. Maybe that's a
11 draft presented at the meeting. I am just assuming
12 here, presented at the meeting. And this is when they
13 approved that and this is the final.
14      Q. Let me see the exhibit label so we know what
15 you're talking about. The draft you think is probably
16 Exhibit 9?
17      A. Yes.
18      Q. And then Exhibit 10 and 11 are the finalized
19 versions of it?
20      A. Yes.
21          MR. BETAR: That's all. It makes it easy.
22          (Brief recess.)
23 BY MR. BETAR:
24      Q. Now I am going to show you another document
25 that's entitled Royal Bahamian Condominium, Inc. Board

Page 92

1  of Directors Meeting, dated May 19th, 2005, at 7:30 p.m.
2       Again, I just want to ask you if you can
3  identify if that is a board of director's meeting
4  minutes to the best of your knowledge.
5          (Exhibit No. 12, Meeting Minutes 05/19/05, was
6  marked for identification.)
7       A. Yeah.
8       Q. I am just looking at the board members
9  present.
10      Nina Melamed, she is still currently a
11 director?
12      A. Yes. She is the treasurer now.
13      Q. Okay.
14      A. And Mrs. Mabel Miller, I think she turned a
15 hundred this week and she runs again for the board.
16      Q. Really? That's a dedicated person.
17      Under agenda, the third bullet says the east
18 building fire pumps were repaired. West building has to
19 have the main gate valve repaired. Awaiting proposal
20 from company. Do you know what was wrong with the fire
21 pumps?
22      A. Not really.
23      Q. Okay. Do you know if the main gate valve was
24 ever repaired?
25      A. Yes.

Page 93

1       Q. Do you know when that was repaired?
2       A. Of the west building, maybe like -- well, I am
3  sure it was repaired before but we just had like another
4  final inspection and then repair and those are also
5  recently like maybe six months ago.
6       Q. The damage from six months ago, what was wrong
7  with it back then?
8       A. No, those are just regular ongoing.
9       Q. Just maintenance issues?
10      A. Yes. Yes.
11      Q. Do you know what the issue was in May 2005
12 with the west main gate valve?
13      A. No, I don't.
14      Q. Okay. Also, under new business, the fourth
15 bullet it says, "Masonry balconies, if no slots water
16 will accumulate and penetrate into the unit." Do you
17 know what was going on with the balconies?
18      A. What is the word slot?
19      Q. Slots is hole, basically.
20      A. No, I don't know.
21      Those balconies were -- all the balconies I
22 believe were from 19, mid 90s were all redone. So, I
23 don't know if maybe they were, if no slots, water will
24 accumulate and will penetrate into the building. All of
25 our balconies are covered.

Page 94

1    Q.  Do you know if there was an issue in May
2  of 2005 of water coming into the units from the
3  balconies?
4    A.  Not that I know of, no.
5    Q.  It would be the board members at the time that
6  would have more information regarding these minutes?
7    A.  I would imagine.
8    Q.  Okay.
9    A.  It is called weep holes instead of slots.  I
10  don't like that word.
11    Q.  Okay.  Let me show you what I am going to mark
12  as Exhibit 13, which is a document from Sterling
13  Contractors and Developers, LLC, that's dated
14  August 9th, 2004.  First, do you know who Sterling
15  Contractors and Developers are?
16    A.  No.
17    (Exhibit No. 13, Sterling Contractors
18  Document, was marked for identification.)
19    Q.  I am going to ask you to take a look at this
20  and see if you have ever seen it before.
21    A.  Okay.
22    Q.  Do you know who Ray Lopez is?
23    A.  No, I don't.
24    Q.  Do you know where unit west 711 is?
25    A.  I know for sure.  I almost bought it instead

Page 95

1  of 506.
2    Q.  After reading this you may be happy.
3    I will just read the first two paragraphs.
4  It's short.  It says, "Dear Mr. Lopez, per your request,
5  I have visited the Royal Bahamian and personally studied
6  the problem with water intrusion into unit west 711."
7  There is a large crack in the stucco, in the stucco -- I
8  think that's a typo, twice -- at floor level of the
9  unit.  It appears that water must be coming through the
10  stucco and block wall.  We would recommend the following
11  repair.  And then it goes to scope of work.
12    Were you aware of water intrusion through
13  cracks through the stucco and walls at Royal Bahamian
14  prior to Wilma?
15    A.  No.
16    Q.  But at least according to this there appears
17  to be at least an issue in unit west 711?
18    A.  It appears but also I don't -- it says block
19  wall and I don't think that our building is block.  But
20  I am not sure.  But, no, I am not aware of that.
21    Q.  Just for clarification, the west building,
22  would that be 1101 Northeast Miami Gardens Drive?
23    A.  It's 1075.
24    Q.  Do you know what 1101 Northeast is?
25    A.  That's the management office mailing address.

Page 96

1    Q.  Okay.  So, it looks like this was mailed to
2  the management office?
3    A.  It looks like, yes.
4    Q.  By accident.
5    Have you ever spoken to Richard Kurzman who
6  signed the letter?
7    A.  I'm sorry?
8    Q.  Have you ever spoken to Richard Kurzman?
9    A.  No.  No.
10    Q.  Do you know who he is?
11    A.  No.
12    Q.  Other than what it says on this letter.  Okay.
13    (Exhibit No. 14, Board Meeting Minutes
14  02/28/00, was marked for identification.)
15  BY MR. BETAR:
16    Q.  I am going to show you what I am going to mark
17  as Exhibit 14, which is an association board meeting
18  minute from February 28th, 2000.
19    You purchased your unit in 2001?
20    A.  Yes.
21    Q.  Prior to the recent amendments of the condo
22  docs that we talked about, do you remember when the last
23  time that the association amended their condo docs was?
24    A.  I don't know.
25    Q.  I am just going to reference you to -- this

Page 97

1  document is Royal Bahamian Condo Association Board
2  Meeting February 28th, 2000?
3    A.  2000.
4    Q.  2000.  It was before you moved in.  This is
5  more of a general question.
6    A.  Okay.
7    Q.  Under the minutes paragraph 2 (I), take a look
8  that, where it says, "All unit owners are advised to
9  have homeowner's insurance to cover damage in their
10  units.  Damage inside the unit is not the responsibility
11  of Royal Bahamian."
12    Do you know what type of damage they are
13  talking about for interior units that would not be
14  covered by the association?
15    A.  Personal property, cabinetry, floor covering.
16    Q.  Floor covering being carpets or hardwood?
17    A.  Yes.
18    Q.  Wallpaper?
19    A.  Unit owners.
20    Q.  Okay.  I am just going to go through a list of
21  things, not exhaustive.  Painting would be unit owner's
22  as well?
23    A.  Yes.
24    Q.  Cabinetry, furniture?
25    A.  Furniture.

1    Q.   Carpeting and floor coverings would be unit
2  owner property?
3    A.   Yes.
4    Q.   What about lighting fixtures?
5    A.   Yes.
6    Q.   Unit owner's?
7    A.   Unit owner's.
8    Q.   Okay.  So, it's those type of things that the
9  unit owner's policies would cover?
10   A.   Yes.
11   Q.   I will break it up into two sections.  Normal
12 maintenance repair, replacement to the windows and
13 sliding glass doors, that would be the unit owner's as
14 well?
15     MR. MAMMEL:  You are asking her for her legal
16     interpretation?
17     MR. BETAR:  I am asking her as the
18     representative of Royal Bahamian what they believe
19     it is.
20   A.   Normal maintenance, unit owner's
21 responsibility.
22 BY MR. BETAR:
23   Q.   Royal Bahamian believes there is a difference
24 in responsibility that goes over to the association
25 after a hurricane.  Is that correct?

1    A.   Rephrase the question.
2    Q.   Sure.  But Royal Bahamian believes that
3  maintenance, repair, replacement of windows from damage
4  from a hurricane is the association's responsibility?
5    A.   Yes.
6    Q.   That has changed in the past few months
7  according to the minutes we are looking at?
8    A.   I think we are discussing two different
9  issues.
10   Q.   Correct.  I am off these minutes now and I am
11 asking you with homeowner's insurance and unit owner's
12 responsibility, you had stated that currently the board,
13 it is the board's position that regular maintenance,
14 repair and replacement of windows and sliders is the
15 unit owner's responsibility.
16   A.   Normal and regular maintenance of the windows,
17 yes.  I can tell you also that when my windows were
18 damaged I went to my homeowner's insurance and they said
19 that's the building's responsibility.  That's when it
20 became ---
21   Q.   Who is your homeowner's insurance policy with?
22   A.   Right now it's -- at the time I think it was
23 Universal -- well, that's my -- yeah, Universal.
24   Q.   Who was your adjuster that told you that from
25 your homeowner's policy?

1    A.   I don't recall his name.  It was Cohen in Palm
2  Beach.
3    Q.   His last name was Cohen?
4    A.   Yes.
5    Q.   In Palm Beach?
6    A.   Yes.
7    Q.   Do you know what the name of his agency is?
8    A.   That's what I am trying to remember if it's --
9  no, I don't.  I can provide that information.
10   Q.   Does he have ---
11   A.   I have changed since then, too.
12   Q.   When he told you that did he have a copy of
13 the association's bylaws?
14   A.   I don't know.
15   Q.   Did he have a copy of the QBE policy when he
16 made that determination?
17   A.   I don't think so.
18     MR. BETAR:  Give me a second to go through my
19     notes.  I think we are about done.
20 BY MR. BETAR:
21   Q.   All right.  Let's take a look at what I am
22 marking as Exhibit 15, which is Royal Bahamian
23 Condominium, Inc.'s minutes of the association meeting
24 held on September 22nd, 2005, at 7:30 p.m., Bates
25 labelled RBA 015339 and RBA 015340.  Look at those and

1  if you can just confirm those are meetings from Royal
2  Bahamian's meeting.
3    A.   Okay.  I am going to point something out to
4  you.  It says board not present Mike Abar (phonetic) and
5  then in the minutes it says Mike also on page two.
6    (Exhibit No. 15, Board Meeting Minutes
7    09/22/05, was marked for identification.)
8    Q.   Okay.  That was one of my questions.  The Mike
9  on page two, Mike Abar?
10   A.   Abar.
11   Q.   Is that a yes?
12   A.   Yes.
13   Q.   On the second page of the September 22nd,
14 2005 minutes, it says, "Painting of buildings, there are
15 many areas where the paint is peeling."  Do you know
16 anything about that issue?
17   A.   No, I don't.
18   Q.   Do you know if they were looking into --
19 because we saw minutes before that were also mentioning
20 the need to repaint the buildings.
21   A.   Right.
22   Q.   Do you know if they were looking to repaint
23 the buildings prior to Hurricane Wilma?
24   A.   I was there in 2001 through 2005 before Wilma.
25 The only thing I can say is normally a painting job is

Page 102

1   seven years, eight years.  We can stretch it.  I don't
2   remember when the last time it was done so maybe as on a
3   normal circumstances or normal length of time it might
4   have been time to, you know, paint the buildings.
5   That's the only thing that -- I know people, a lot of
6   people didn't like the color.  We have a battle gray
7   color building and a lot of people -- maybe some people
8   also used that.
9       Q.  Was the building painted before Hurricane
10  Wilma between September 2005 and October 24th, 2005?
11      A.  No.
12      Q.  Okay.  Then the fifth paragraph down on the
13  second page it says, Mike -- and I think we believe that
14  is Mike Abar.  It says, Mike asked if we had a report of
15  damage from Hurricane Wilma.  Mike stated that he did a
16  walkthrough and the report from Gloria ready.  And I am
17  assuming they are meaning Gloria Diaz, not hurricane
18  Gloria.
19      A.  Yes.
20      Q.  Do you know where that report from Hurricane
21  Katrina is?
22      A.  No, I don't.
23      Q.  If ---
24      A.  There is other thing also that I would like to
25  state here.  The property manager is Marta and then

Page 103

1   Gloria is -- okay.  Marta is the owner of Universal
2   Management.
3       Q.  Okay.
4       A.  She is Gloria Diaz's boss.  I find these
5   minutes very much inaccurate and maybe you will also.
6       Q.  Well, I am going to ask if you can have your
7   property manager, whoever, look through your records to
8   see if you can find that Hurricane Katrina damage report
9   and if you can find it to give it to your counsel to
10  give it to us.
11      A.  I don't think that there was ever a ---
12      Q.  Okay.  Then on the eighth paragraph down it
13  says, "Seawall, Robert stated that management was aware
14  of the problems with the seawall and we were getting
15  proposals, repairs and maintenance of it."
16      A.  Yeah.
17      Q.  Do you know what they are talking about?
18      A.  Yes, I do.  You see, that's what I -- that's
19  what I am saying.  These minutes are horrible because
20  the seawall, we don't have anything to do with the
21  seawall.  It's from the water management.  We don't
22  maintain it and I personally researched it also for
23  insurance purpose and we don't have to.  So, I don't
24  know.
25      Q.  So, that's not part of your Hurricane Wilma

Page 104

1   claim?
2       A.  No.
3       Q.  That won't be part of any subsequent claims
4   for Hurricane Wilma?
5       A.  No.
6       Q.  Under that it says, "Robert thanks Steven
7   Reinstein for bringing up the subject of the leaks and
8   assured him that the leaks will be taken care of."
9           Do you know what leaks he is talking about?
10      A.  No.
11      Q.  Again, we probably have to talk to somebody
12  who was on the board at the time to see if they had any
13  more detail.
14      A.  Yes.
15      Q.  That is a yes?
16      A.  Yes.
17      Q.  How old were the elevators at the time of
18  Hurricane Wilma?
19      A.  They must be the originals.
20      Q.  Okay.  I am going to show you a meeting minute
21  from October 8th, 2001, that I will mark as Exhibit 16.
22          (Exhibit No. 16, Meeting Minutes 10/18/01, was
23  marked for identification.)
24      A.  Okay.  Ask me your questions.
25  BY MR. BETAR:

Page 105

1       Q.  Are these board of director meeting minutes?
2       A.  They look like it, yes.
3       Q.  Beginning on the second page, third bullet
4   down, Bates label RBA 082669, it says, "Robert Klein
5   advised that we have been delaying the issue of
6   upgrading the elevators.  In the near future they will
7   have to be upgraded.  Parts are being salvaged for
8   repairs at the present time."
9           Do you know if at any time between
10  October 2001 and October of 2005 if those elevators were
11  ever replaced or upgraded?
12      A.  Not replaced but, yes, we had a special
13  assessment.
14      Q.  Okay.  Were all of the elevators upgraded?
15      A.  Yes.
16      Q.  Are the elevators part of the Hurricane Wilma
17  claim?
18      A.  Yes.
19      Q.  What damage to the elevators came from
20  Hurricane Wilma?
21      A.  For the elevators?
22      Q.  Yeah.
23      A.  I don't recall, unless there was water in the
24  pit and we had to replace the air-conditioning but I am
25  not familiar with damages to the elevators.

Page 106

1    Q.  Who would have looked at that for Royal
2  Bahamian?
3    A.  I'm sorry?
4    Q.  Who would have looked at the elevators,
5  inspected them for Royal Bahamian for purposes of the
6  claim for Hurricane Wilma?
7    A.  I don't know.
8    Q.  Who would know that, Mr. Keys?
9    A.  The elevator inspected?
10      They are above the roof.  You know, the
11  mechanical room is above the roof and that little roof
12  was replaced, I believe, also.  I don't know.
13    Q.  Okay.  I am just talking about specifically
14  damage from hurricane, damage to the elevators from the
15  hurricanes.  Who would have the most knowledge as to
16  that area?
17    A.  I don't know.
18    Q.  But Mr. Keys is not?
19    A.  But this is not -- the elevator here that was
20  repaired was nothing to do with the hurricanes, right.
21    Q.  I understand that.  I am just asking now.  You
22  have confirmed that elevators are part of your claim for
23  Hurricane Wilma.
24    A.  They are?
25    Q.  I asked you that and you said yes.

Page 107

1    A.  No.
2    Q.  The answer is no.  Let me re-ask the question.
3      Are the elevators part of the claim for
4  Hurricane Wilma?
5    A.  No.
6    Q.  Okay.  Then we can move on.
7      Going down to the fifth bullet on the second
8  page, it also says, "Robert Klein advised that estimates
9  have been received.  We also have to consider the roof
10  in the near future.  So far we have been able to patch
11  them.  They will eventually have to be replaced."
12      Do you know if between October 2001 and
13  October 2005 the roofs on Royal Bahamian were replaced?
14    A.  Not replaced.
15    Q.  But at least as far as back as 2001 there were
16  some conversations about replacing them?
17    A.  Once again, there is life expectancies
18  sometimes that people go by.  They want to have things
19  done.  I imagine that's what -- I don't recall anybody
20  having problems with the roof.
21    Q.  Okay.  But in 2001 they were mentioning that
22  eventually they will have to be replaced?
23    A.  Eventually.
24    Q.  Mr. Keys, when he was doing his evaluation of
25  the Royal Bahamian, was he given any of the meeting

Page 108

1  minutes to review?
2    A.  Yes.  Not all these minutes, but, yes.
3    Q.  You say I imagine.  Do you know for certain he
4  was given ---
5    A.  No, I don't know for sure.  I know we gave
6  them a lot of records which the minutes should have
7  been, you know, on those also.
8    Q.  Who would have given those to him?
9    A.  I'm sorry?
10    Q.  Who would have given those to him?
11    A.  Who would have given who?
12    Q.  The minutes to Mr. Keys.
13      Wait, let me rephrase the question.  Who would
14  have been given Mr. Keys the board meeting minutes to
15  review?
16    A.  It would have been the manager who was at the
17  office at the time.
18    Q.  Who would that have been?
19    A.  I would say I think it's Michelle Smith.
20    Q.  Is she still there?
21    A.  No.
22    Q.  Why did she leave?
23    A.  She left, I think, in, a couple of -- two
24  months ago maybe.
25    Q.  I am going to show you what I am marking as

Page 109

1  Exhibit Number 17 and it is titled Royal Bahamian
2  Condominium Association Inc.'s Minutes of the Board of
3  Directors Meeting held on July 19th, 2007, at 7:30 p.m.
4    A.  Okay.
5      (Exhibit No. 17, Meeting Minutes 07/19/07, was
6  marked for identification.)
7  BY MR. BETAR:
8    Q.  It's not very easy to figure out where these
9  paragraphs start and end on this one, but do you see
10  where the sentence starting with Mr. Turtula then turned
11  the meeting over.  Do you see what I'm reading?
12    A.  Uh-huh.
13    Q.  I am just going to read it.
14      Mr. Turtula then turned the meeting over to
15  Mr. Douglas Mercado of Criterium Inspection Engineers
16  who explained the structural inspection report.  Do you
17  know who Criterium inspection engineers are?
18    A.  Yes.
19    Q.  Who are they?
20    A.  They are an engineering firm.
21    Q.  Why were they retained to look at Royal
22  Bahamian?
23    A.  To look at the roof and the building that
24  needed to be repaired.
25    Q.  The next paragraph starts, "Slide show

Page 110

1  presentation of structural problems was shown
2  simultaneously.  As he reviewed the structural
3  deficiencies of the building, Mr. Mercado explained that
4  the structural problems did not happen overnight, that
5  this was many years of neglect."
6      What structural problems was he talking about?
7      A.  I think he is selling his business because as
8  of today it says something that didn't happen overnight.
9  Many years of neglect.  I don't know.  One thing I can
10  tell you is that he is no longer working with us.
11      Q.  I understand that, but do you know what
12  structural problems he is talking about?
13      A.  No, I don't.
14      Q.  You did have him look at structural problems.
15  Is that why you asked him to go out?
16      A.  At the time they hired him because the 40-year
17  recertification was coming up due in 2008 and we needed
18  to have an engineer to prepare the report.
19      Q.  Okay.  On the next paragraph it says, "The
20  structural report also indicates that there are many
21  windows leaking.  The ideal thing would be to replace
22  all the windows but this will cost a lot of --" and
23  there is about eight dollar signs -- "so the next best
24  thing is to re-caulk the windows and repair the concrete
25  around them in the areas where they are leaking."

Page 111

1      Do you know if the windows were ever caulked?
2      A.  No.
3      Q.  Were they ever repaired?
4      A.  No.
5      Q.  So, as we sit here today, there is still water
6  leaking in through these windows?
7      A.  Yes.
8      Q.  And the association has done nothing to stop
9  the water?
10      A.  We tried, yes.
11      Q.  What did you do to try to stop them?
12      A.  Tried to do the best we can from inside.  Like
13  I said, we cannot go from the outside.  Some unit owners
14  like me decided to just go ahead and ---
15      Q.  I understand the unit owners.  The association
16  can go on the outside and do repairs if they wanted.
17  Correct?
18      A.  Correct.
19      Q.  Has the association done something to go
20  outside?
21      A.  No.
22      Q.  Why not?
23      A.  No funds.
24      Q.  But according to this it appears at least that
25  the leaking issue could be solved with repairs.  You

Page 112

1  don't necessarily need to replace all the windows at
2  Royal Bahamian?
3      A.  I don't think so.
4      Q.  You don't think so what?
5      A.  I don't think that it can be.
6      Q.  I am just asking what this report says from
7  your understanding.
8      A.  Yes, that's what it says.
9      Q.  I am going to show you something I am going to
10  mark as Exhibit 18 from Criterium Inspection Engineers.
11  It's a letter dated December 27th, 2007, Attention Marta
12  Bascoy from Douglas Mercado.  I am going to read the
13  first sentence where it says, "We received a call today
14  from Mr. Gustavo Turtula indicating that this past
15  weekend some units sustained some water damage coming
16  from the roof areas where the mechanical contractor is
17  working.  It seems that the roof was not properly
18  protected and was exposed to wind-driven rain.  We have
19  contacted the contractor and made arrangements for one
20  of our engineers to meet with him at the site to review
21  this issue.  We have also reminded the contractor that
22  he is responsible for any damage caused to the
23  apartments while working on the roof.  An assessment
24  will be made today, December 27th, and a report will
25  follow."

Page 113

1      Do you know if a report was ever made?
2      (Exhibit No. 18, Letter Dated 12/27/07, was
3  marked for identification.)
4      A.  Yes.
5      Q.  Do you know if that was produced in your
6  production?
7      A.  I don't know.  This is in litigation also.
8      Q.  What is the litigation about?
9      A.  Against the inspection engineering and the
10  contractor that he recommended at the time, Roman's
11  Waterproofing.  There was damage when they were
12  repairing the roof.
13      Q.  When Roman's was repairing the roof they --
14      A.  He was replacing.
15      Q.  -- ended up damaging the roof by doing that?
16      A.  Correct.
17      Q.  That allowed water to get into some of the
18  units?
19      A.  Through the air-conditioning openings.
20      Q.  Do you know how many units were affected?
21      A.  Maybe two on the penthouse.
22      Q.  Do you know which unit that was?
23      A.  The west building.
24      Q.  On the penthouse floor?
25      A.  On the penthouse floor.

Page 114

1    Q.  Do you know who Dan Laverich is?
2    A.  I'm sorry.
3    Q.  Daniel Laverich?
4    A.  That's the name of somebody.
5    Q.  Yes?
6    A.  No.
7    Q.  I am going to represent that he is an engineer
8  that QBE retained to go look at the roofs, at the
9  structures.  He inspected the roof and took some
10 pictures.  I am going to show you some pictures I am
11 going to mark as Exhibit 19 that according to the sheet
12 were taken on February 7th, 2007.  I am going to ask you
13 to look at two pictures.  One I am going to put a number
14 one next to and the other one I am going to put a number
15 two next to.
16   A.  Okay.
17       (Exhibit No. 19, Photographs, were marked for
18 identification.)
19 BY MR. BETAR:
20   Q.  Can you tell me what that is coming out of the
21 roof in pictures one and two?
22   A.  It's kind of a tree but I cannot tell you what
23 kind it is.  I am familiar with that.
24   Q.  When you went on the roof back in 2005, did
25 you see the roof, the tree growing through the roof?

Page 115

1    A.  Yes.
2    Q.  The association didn't plant that tree in the
3  roof, did it?
4    A.  No.
5    Q.  Do you know how the tree got to be there?
6    A.  Yes.
7    Q.  How is that?
8    A.  Because there was moisture in the corner area,
9  which is not unusual.  I know enough of construction and
10 roof for the tree to grow.  The birds are taking the
11 seeds and then it grows.
12   Q.  That was there when you went on the roof in
13 2005?
14   A.  Yes.
15   Q.  Is it still there today?
16   A.  No.
17   Q.  You have replaced the roof.  Correct?
18   A.  And the trees.
19   Q.  You haven't put a new tree in the new roof,
20 have you?
21   A.  No, in a pot.
22   Q.  Who replaced the roofs?
23   A.  Advanced Roofing.
24   Q.  That's right, they took over for Roman's.
25       I am also going to show you a letter from

Page 116

1  Melissa Sims to Royal Bahamian care of Chris Mammel
2  dated October 2nd, 2009.
3        (Exhibit No. 19, Letter From Melissa Sims
4  Dated 10/02/09, was marked for identification.)
5    A.  Excuse me, I would like to -- now that I am
6  looking, these pictures were taken in 2007?
7    Q.  I am not sure of that.  That's when they seem
8  to be dated.
9    A.  Yeah.  That's way after Wilma, though.
10   Q.  Yes.  I am going to show you this letter.  I
11 first ask you if you have ever seen the letter, just
12 generally.
13       Well, first I will ask you if you have ever
14 seen this letter.  You know what, I should mark it as
15 well.  Let me mark it.
16       On the second page, the second paragraph, it
17 states, "Given the new scope of this claim, QBE hereby
18 invokes its right under the policy to inspect the
19 insured's property with particular attention to the
20 newly claimed damages.  Please contact our office to
21 contact dates when QBE can come out to the property for
22 inspection.  Given the scope of this claim and the
23 pending EUO, QBE would like to come out and do the
24 inspection as soon as possible."
25       Do you know if anyone from Royal Bahamian has

Page 117

1  contacted QBE to coordinate that inspection?
2    A.  I don't know and I don't think so.
3        (Exhibit No. 20, Letter, was marked for
4  identification.)
5  BY MR. BETAR:
6    Q.  Do you know who is the person that QBE would
7  speak to to set up that inspection?
8    A.  It would be me.
9    Q.  I am assuming through your counsel.
10   A.  Right now, yes.
11   Q.  I would just ask afterwards if you can have
12 your counsel contact I guess my office with some
13 possible dates for the reinspection it would be
14 appreciated.
15   A.  No problem.
16   Q.  Previously you had stated that the association
17 hadn't addressed the issues with the leaking around the
18 windows and the doors due to financial reasons,
19 partially.  Is that correct, the money?
20   A.  Yeah, that was an issue.
21   Q.  Okay.  I am going to show you what I marked as
22 Exhibit Number 21 and ask you if you recognize it's.  It's
23 two pages.  For the record, it's Bates labeled upper
24 right hand corner RBA 041550 and RBA 041537.
25       (Exhibit No. 21, Document, was marked for

Page 118

identification.)

BY MR. BETAR:

2

3
4    Q.   Are you familiar with those documents?
5    A.   Yes.
6    Q.   It appears from those documents November 27th,
7  2005, just a month after Hurricane Wilma the board
8  approved to redo the pavers at Royal Bahamian.  Is that
9  correct?
10   A.   Yes.
11   Q.   The project started in 2006?
12   A.   Yes.
13   Q.   Do you know how much money was spent on that
14  project?
15   A.   No, I don't.
16   Q.   That was done prior to replacing the roofs?
17   A.   Yes, of course.
18   Q.   Since no work has been done to the windows and
19  the leaks, it's been done prior to any of those issues
20  were addressed as well.  Correct?
21   A.   Yes.
22   Q.   What was the issue with the pavers that was
23  addressed in 2005, 2006?
24   A.   Okay.  Those are the kind of things that
25  decided the Turtula's president to recall the other

Page 119

1  board for not doing the proper things.
2    Q.   Those weren't the result of hurricane damage,
3  were they, the pavers issue?
4    A.   No.
5    Q.   Why were they being replaced, just curiously?
6    A.   I don't know if I can answer that question.
7  Can I ask my ---
8    Q.   I would wait until that question is answered.
9         MR. MAMMEL:  What is that question again so I
10  have it in my mind?
11  BY MR. BETAR:
12   Q.   Why were the pavers replaced?  Why did the
13  association decide to do that project?
14   A.   That's a difficult question for me to --
15  again, I am going to tell you again it's because --
16  that's the reason why this board was recalled.
17   Q.   Okay.
18   A.   The board was recalling -- the unit owners
19  were recalling this board because they were convinced
20  that the board under Mr. Klein were doing
21  inappropriate ---
22   Q.   But my question was, why were the pavers
23  replaced?
24   A.   Somebody maybe was having some interest,
25  personal interest in that.

Page 120

1    Q.   Okay.  Can you expand on that?  I mean, you
2  said maybe somebody was having a personal interest in
3  that.  I'm just trying to -- what to me seems to be a
4  simple question as to why were the pavers replaced you
5  don't seem to be able to answer?
6    A.   The reason I don't want to answer is because I
7  don't want to accuse anybody of doing inappropriate
8  things and asking us money for something that didn't
9  need to be done when the roof needed to be done and
10  instead they did some pavers.
11   Q.   Let me try to get it a different way.
12        MR. MAMMEL:  I think she just gave you an
13  answer.
14  BY MR. BETAR:
15   Q.   Was there any damage to the pavers?
16   A.   No.  They just didn't like it.
17   Q.   It was an aesthetic reason?
18   A.   Yes.
19   Q.   Who was the president at the time when they
20  chose to replace the pavers?
21   A.   Mr. Klein.
22   Q.   A project like that would that be voted on by
23  the general membership of the association?
24   A.   No.
25   Q.   Let me finish.  And a project like that would

Page 121

1  that be voted on by the general population of the
2  association?
3    A.   No.
4    Q.   That would be the board?
5    A.   Yes.
6    Q.   The board voted to replace the pavers for
7  aesthetic reasons in 2005?
8    A.   Yes.
9    Q.   I am going to show you three exhibits.  They
10  are very similar in nature yet different which are
11  Exhibits 22, 23 and 24.
12        (Exhibit No. 22, East Building Reports, was
13  marked for identification.)
14        (Exhibit No. 23, West Building Report, was
15  marked for identification.)
16        (Exhibit No. 24, Sole Report, was marked for
17  identification.)
18  BY MR. BETAR:
19   Q.   Did Royal Bahamian send out a questionnaire
20  following Hurricane Wilma regarding damages the units
21  may have had?
22   A.   I don't recall exactly.
23   Q.   Let me show you the exhibits and see if it
24  refreshes your memory.
25        Does that refresh your memory?

1    A.  Well, yes and no.  I don't see -- I know that
2  I reported it and I don't see my unit in here.
3    Q.  That was going to be my next question but
4  first just the generic question.
5        Was the survey sent to the unit owners to
6  report any damages?
7    A.  It looks like it, yes.
8    Q.  Second of all, I have two stacks, three stacks
9  actually.  Exhibit Number 23 we have separated into the
10 west building reports.  Exhibit Number 22 we separated
11 into the east building reports and Exhibit Number 24 is
12 all by its lonesome because it just says unit number.
13 It doesn't say which building.
14       Look at 24, do you know which building this
15 is?
16       I don't know if there is a way for you to
17 identify it.
18   A.  (No verbal response.)
19   Q.  Is that a no?
20   A.  No.
21   Q.  Do you know who Immacula A is?
22   A.  No.
23   Q.  Well, it will be a mistery unit but these
24 three exhibits combined, do you know if these were all
25 the surveys turned over to Royal Bahamian?

1    A.  I don't know.
2    Q.  You said you didn't see yours in here?
3    A.  No.
4    Q.  Did you fill one out?
5    A.  I don't remember.  I know that I reported it
6  but I don't remember filling out a survey like this.
7    Q.  So maybe you just didn't fill out the survey?
8    A.  Maybe, but I am surprised because I had a lot
9  of damages.
10   Q.  Do you know who these surveys were turned
11 into?
12   A.  No, I don't.
13   Q.  Do you know if copies of these surveys are
14 still in the management office?
15   A.  They should be.
16   Q.  I am going to give you a copy of Exhibits 23,
17 22 and 24 before you leave today.  I am going to ask
18 that you ask your property manager to confirm these were
19 all the reports that were turned in.  If they weren't,
20 if you can turn them over to your counsel ---
21   A.  What date was it?
22   Q.  The letter was dated November 11th, 2005 and
23 it looks like the association gave it to the unit owners
24 and they'd fill it out but it doesn't have a date when
25 they turned it back so it's some day after

1  November 11th, 2005.
2        MR. BETAR:  Let's take a two-minute break and
3    I will go through my notes.
4        (Brief recess.)
5  BY MR. BETAR:
6    Q.  Ms. Lelievre, I don't believe I have any
7  questions left currently at this time.  Once we get the
8  documents, if there are any additional documents
9  responsive to our request today, I may have some
10 follow-up questions for you but I will discuss that with
11 your counsel at that time.
12       I thank you for coming today.  We will have
13 the examination under oath typed up and sent to your
14 counsel for you to come and review it, make any notation
15 if you think the court reporter may have written
16 anything down inaccurately and then have you pursuant to
17 the policy sign it and send it back to us.
18       MR. MAMMEL:  She mentioned during the break
19    that she just had a couple of areas that she is not
20    sure she gave you the right answers to and she
21    wants to clarify.
22 BY MR. BETAR:
23   Q.  Go ahead and clarify.
24   A.  One is regarding my homeowner insurance.  I
25 think -- I am going to confirm that.  I don't believe I

1  had homeowner's insurance in 2005 at the time of Wilma.
2    Q.  You did not?
3    A.  I did not.  I don't think so because at the
4  time I didn't think of putting a claim for the windows
5  and all of that.  But when I realized that I needed to
6  change my window and I called my insurance, at the time
7  I had my insurance but without any question, they
8  told me that no, the windows were not covered by my
9  insurance policy.  So, it's correct that I called my
10 insurance agent at the time, but I don't think it was at
11 the time of Wilma in 2005.
12   Q.  Did they ever send you anything in writing
13 regarding that?
14   A.  I don't think so, no.
15   Q.  Okay.
16   A.  I didn't pursue it also because of what I
17 heard around and not just where I worked but all around
18 that.  So, that's that.
19       The other one is I think I got confused about
20 the picture on the roof with the trees because, yes, I
21 did see things like this but I believe it was when I --
22 it kind of refreshed my memory when I saw the date
23 because I don't remember seeing that when I went on the
24 roof with Gloria.  But I remember seeing that and I
25 believe it's when we started getting bids and contracts

Page 126

1  to do the roofs in 2007 and 2008 that I did see that.
2       Q.   Anything else?
3       A.   That's it.
4            MR. BETAR:  Okay.  Well, thank you very much
5       for coming.  We will be sending you a copy.  Thank
6       you.
7  (The examination under oath was concluded at 3:10 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 127

1            CERTIFICATE OF OATH
2
3  STATE OF FLORIDA
   COUNTY OF MIAMI-DADE
4
5       I, the undersigned authority, certify that
6  GINETTE LELIEVRE personally appeared before me and was
7  duly sworn.
8       WITNESS my hand and official seal this 3rd day
9  of November, 2009.
10
11
12
13       _____
         Patricia Benedit Diaz, FPR
14       Notary Public - State of Florida
         My Commission No. DD 538979
15       My Commission Expires 04/17/2010
16
17
18
19
20
21
22
23
24
25

Page 128

REPORTER'S CERTIFICATE

STATE OF FLORIDA
COUNTY OF MIAMI-DADE

          I, Patricia Benedit Diaz, Florida Professional
Reporter and Notary Public in and for the State of
Florida at large, do hereby certify that GINETTE
LELIEVRE was by me first duly sworn to testify the whole
truth; that I was authorized to and did report said
examination under oath in stenotype; and that the
foregoing pages, numbered from 1 to 128, inclusive, are
a true and correct transcription of my shorthand notes
of said examination under oath.

          I further certify that said examination
under oath was taken at the time and place hereinabove
set forth and that the taking of said examination under
oath was commenced and completed as hereinabove set out.

          I further certify that I am not an attorney or
counsel of any of the parties, nor am I a relative or
employee of any attorney or counsel of party connected
with the action, nor am I financially interested in the
action.

          The foregoing certification of this transcript
does not apply to any reproduction of the same by any
means unless under the direct control and/or direction
of the certifying reporter.

          IN WITNESS WHEREOF, I have hereunto set my
hand this 3rd day of November, 2009.


                    _____
                    Patricia Benedit Diaz, FPR