**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
Miami Division

**Case No. 10-21511-CIV-MORENO/GOODMAN**

ROYAL BAHAMIAN ASSOCIATION, INC.,

      Plaintiff,

v.

QBE INSURANCE CORPORATION,

      Defendant.

_____/

**REPORT AND RECOMMENDATIONS ON PLAINTIFF'S MOTION FOR SUMMARY**
**JUDGMENT AND DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

THIS MATTER is before the Court on the Motion of Plaintiff, Royal Bahamian Association, Inc. ("Royal Bahamian"), for Summary Judgment, and the Motion of Defendant, QBE Insurance Corporation ("QBE"), for Partial Summary Judgment. (8/12/2010, DE# 53; 8/12/2010, DE# 55).[1]  Having reviewed the applicable filings and the law, and for the reasons stated below, I respectfully recommend that the District Court grant Royal Bahamian's motion in part and deny it in other part.  I also respectfully recommend that the District Court deny QBE's motion for partial summary judgment.

**I.       Factual Introduction**

This case involves the claim of an insured, Royal Bahamian, against its property insurer, QBE, for claimed damages to its insured property allegedly caused by Hurricane Wilma in 2005.  Royal Bahamian is a condominium association charged with managing two eight-story buildings with 164 total units located in North Miami Beach, Florida.

---

[1]      All dispositive pretrial motions have been referred to me for a report and recommendation. The Honorable Federico A. Moreno, Chief Judge of the United States District Court for the Southern District of Florida, initially referred these motions on July 26, 2010 to United States Magistrate Judge Edwin G. Torres, who then, on July 28, 2010 transferred the referral to me pursuant to Administrative Order 2010-79.  (DE# 37; 40).

(8/12/10, DE# 56, ¶ 1.)   Approximately four years after Hurricane Wilma, Royal Bahamian submitted a sworn proof of loss to QBE claiming damages of $8,475,190.75.

Royal Bahamian alleges to have calculated this amount based upon the opinions of experts it hired for the purpose of assessing the claimed damage.  (*Id.* at ¶ 17.)  QBE denied Royal Bahamian's claim on May 5, 2010, approximately one month after Royal Bahamian filed its lawsuit.  (*Id.* at ¶¶ 20-21.)

QBE acknowledged that some of Royal Bahamian's claimed damages were caused by a covered cause, however, while stating that it reserved its right to assert other defenses against contractual liability, QBE denied the claim because it believed Royal Bahamian violated the insurance policy's "Concealment, Misrepresentation or Fraud" provision.  (*Id.* at 22.)  Primarily, this specific ground for denial was premised upon Royal Bahamian allegedly including non-covered property in its claim and making a claim that was inflated and/or unsubstantiated.  (DE# 55-20, p. 4.)  In addition, QBE's coverage denial was also based on its position that windows and sliding glass doors, which are a majority of the payment demand, are not covered under the policy because these items are the individual unit owners' responsibility. (May 5, 2010 denial letter, DE# 55-20.)

## II.   Procedural Background

Royal Bahamian filed its Complaint on April 2, 2010, seeking an appraisal as well as damages for breach of the insurance policy.  (DE# 1-2.)  On June 11, 2010, the District Court stayed the petition for appraisal pending resolution of the count for breach of contract.  (DE# 19.)  On August 12, 2010, both parties moved for summary judgment. (DE# 53; DE# 55.)  Responses and replies to both motions were also filed by the parties. (9/7/2010, DE# 91; 9/7/2010, DE# 93.)

In its motion for partial summary judgment, QBE asks the Court to conclude that the applicable insurance policy does not provide coverage for Hurricane Wilma-related

damage to the screens, windows and sliding glass doors[2] of individual condominium units.  In its motion, QBE contends that the policy unambiguously *does not cover* these items, that the interpretation of an insurance policy is a matter of law for the Court, and that therefore it is entitled to summary judgment as a matter of law on this coverage issue.

Similarly, Royal Bahamian moved for summary judgment on this coverage issue, though it classifies the issue as primarily relating to QBE's first affirmative defense and tangentially relating to the ninth affirmative defense.  Royal Bahamian describes QBE's first affirmative defense as "the insurance policy ("the Policy") [does not] cover damage to sliding glass doors and windows ("fenestrations").  (DE# 55, p.1).  In its motion, Royal Bahamian describe QBE's ninth affirmative defense as one based on alleged fraud and misrepresentation and "which relies, in part, on the position that fenestrations are not covered under the policy."

 QBE's first affirmative defense, however, does **not** assert the position that these property items are not covered items under the policy.  To the contrary, the first affirmative defense is that the damage "was not **caused** by Hurricane Wilma, and thus the conditions complained of are not covered under the subject policy of insurance." (emphasis supplied).

Ironically, *none* of QBE's affirmative defenses expressly assert the position that screens, windows and sliding glass doors are not covered property items under the insurance policy.  The first sentence of the first affirmative defense contends that the "damages" were "not the result of a direct physical loss to covered property caused by a covered peril."  After this broad defense, which appears to be applicable to all claimed property damage and not only damages to screens, windows and sliding glass doors, QBE then provides greater clarity to the defense:   "Specifically, Plaintiff's claimed

---

2　　　In their filings, the parties also sometimes refer to these items as "fenestrations."

damages to windows, sliding glass doors, **interiors** and **other property** was [sic] **not caused by Hurricane Wilma**, and thus the conditions complained of are not covered under the subject policy of insurance."  (emphasis supplied).

Therefore, the first affirmative defense is **not** one which asserts the position that the items at issue in Plaintiff's summary judgment motion – "sliding glass doors and windows" – are not covered items under the policy's definition.  Rather, this defense is that none of the claimed damages (*i.e.*, damage to "other property") were caused by the hurricane.

Likewise, QBE's ninth affirmative defense is that the policy's conditions provide "remedies in the event of concealment, misrepresentation, or fraud."  After describing its own defense, QBE then quotes the "concealment, misrepresentation or fraud" section and then refers to section 817.234, Florida Statutes, which it summarizes as a statute concerning insurance fraud.  QBE's ninth affirmative defense then provides examples of what it deems "false, incomplete or misleading information" (*i.e.*, the statutory terminology).  For example, QBE's ninth affirmative defense contends that the claim seeks damages for "pre-existing conditions" and damages "not related to the Hurricane."  The final sentence of this ninth affirmative defense may, under an *extremely* liberal interpretation, *indirectly* relate to the contract-based defense at issue in the competing summary judgment motions: "Further, Plaintiff has knowingly demanded payment on items for which it [sic] is not responsible and which are not insured under the subject policy."  Obviously, this does not expressly and directly assert that screens, sliding glass doors and windows are not covered because they do not fit the definition of covered property.

Despite the fact that none of QBE's affirmative defenses expressly contend that screens, windows and sliding glass doors are not, by definition and contract interpretation, covered by the policy, the parties seemed to have operated under the

assumption that there is such a defense (or that summary judgment on the issue is appropriate). To be sure, QBE's denial letter specifically mentions contract interpretation and definition as a ground for the non-coverage decision. And Royal Bahamian has not raised the argument that QBE has not properly asserted this contract-based defense in this lawsuit. Indeed, Royal Bahamian agrees that whether windows and sliding glass doors are covered under the insurance policy is a pure question of law involving no disputed factual questions. Royal Bahamian, however, asks the Court to reach the exact opposite conclusion and determine that windows and sliding glass unambiguously *are covered* under the policy. Thus, QBE and Royal Bahamian have, in effect, submitted cross-motions for summary judgment, albeit with different conclusions based upon the same undisputed facts and law.

The competing summary judgment motions are not quite purely opposite versions of the same argument, however. Royal Bahamian's contract-based motion contends that windows and sliding glass doors are covered but does not assert that *screens* are covered. QBE, in contrast, contends that windows, sliding glass doors *and* screens are not covered. Because Royal Bahamian seeks a summary judgment ruling only on sliding glass doors and windows, my recommendation that the Court grant this part of the summary judgment motion in Royal Bahamian's favor will be limited to the two items mentioned in its motion (*i.e.*, windows and sliding glass doors). *See Robinson v. Lorillard Corp.*, 444 F.2d 791, 803 (4th Cir. 1971) ("a remedy desired by none of the parties should not be forced upon them"). *Cf. Glenn v. First Nat'l Bank,* 868 F.2d 368, 371 (10th Cir. 1989) (because the appellant did not file a motion for leave to amend the complaint, the district judge did not err in not ruling upon an informal request). *See also generally Alpine Bank v. Hubbell,* 555 F.3d 1097, 1114 (10th Cir. 2009) ("the failure to grant unrequested relief is not error").

5

Royal Bahamian also moves for summary judgment on QBE's ninth affirmative defense -- concealment, misrepresentation or fraud.   At bottom, Royal Bahamian contends that QBE has no evidence of fraud and that disputes over coverage do not equate to fraud.   QBE, however, contends that this defense is a jury issue and it has provided illustrations of what it deems to be genuine factual issues.   As outlined below, this defense raises material factual issues which cannot be resolved by summary judgment, which is why I am recommending denial of this portion of Royal Bahamian's motion.

### III.    Other Procedural Issues

In reviewing these filings, the Court noted some procedural issues that bear discussing before addressing the merits of these motions.   Southern District of Florida Local Rule 7.5(a) requires a movant to submit, among other things, "a concise statement of the material facts as to which the movant contends there exists no genuine issue to be tried."   Subsection (b) of this rule requires a party opposing a summary judgment motion to also file a "single concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried."   Subsection (c) specifies the contents of the statement of material facts submitted either in support or in opposition to a summary judgment motion.

Specifically, subsection (c) requires the statement to not exceed ten (10) pages in length, to be supported by specific supporting references and to consist of separately numbered paragraphs.[3]   In addition, statements of material facts submitted in opposition to a summary judgment motion "shall correspond with the order and with the paragraph numbering scheme used by the movant."   If a party opposing a summary judgment

---

[3]        The local rule does not expressly require the statement of material facts to be a separate document, but that is typically the practice in this district.

motion wishes to include "additional facts," then the party is required to number them and place them at the end of the statement of material facts.

According to the 2008 Comments to Local Rule 7.5, the rule was amended to "ensure that statements of material facts filed by movants and opponents shall **correspond with each other in numerical order** so as to make review of summary judgment motions **less burdensome to the Court**."  (emphasis supplied).

QBE did not file a separate concise statement of undisputed material facts in support of its summary judgment motion.  Nonetheless, the motion included an incorporated section entitled "statement of material facts" and the paragraphs were, in fact, numbered and contained references to the supporting factual source material. Royal Bahamian, on the other hand, did file a separate statement of material facts in support of its summary judgment motion.  (DE# 56.)

However, in opposing QBE's motion for partial summary judgment, Royal Bahamian did not submit a separate statement of material facts.  Instead, it included a section, beginning on page 2, entitled "statement of facts in dispute."  The paragraphs were not separately numbered, but they mentioned the paragraph numbering being discussed.  For example, Royal Bahamian's response said, "While Plaintiff admits that paragraph 9 accurately quotes certain excerpts from the condominium documents, the documents must be read as a whole."

QBE followed the local rule in its response to Royal Bahamian's summary judgment motion by submitting a separate statement of material facts and by consecutively numbering the paragraphs to correspond to Royal Bahamian's motion.

Local Rule 7.1(c) provides that a reply memorandum shall be strictly limited to "rebuttal of matters raised in the memorandum in opposition without reargument of matters covered in the movant's initial memorandum of law."  In its reply, QBE argues for the first time that Royal Bahamian is not entitled to coverage because, unlike in the

*Mayfair* case (which is discussed more fully below), Royal Bahamian's condominium declaration does not specifically use the term "windstorm" with regard to casualty insurance. (DE# 112, §§ 2-3.)

While QBE's motion and Royal Bahamian's response both discuss whether or not Royal Bahamian's obligations included coverage of windows and glass sliding doors, QBE's new argument in its reply is more specific and of a different character.  In the motion and response, neither party discussed the absence of the word "windstorm" in the declaration.  QBE attempts to classify this new argument as merely distinguishing the Mayfair decision.  However, QBE anticipated Royal Bahamian's reliance on Mayfair and attempted to distinguish it in its separate motion to compel.  QBE's motion to compel did not raise this distinction and Royal Bahamian did not argue that this difference had any significance in its response.  QBE's failure to abide by the local rules by raising a new argument in a reply is surprising.  In an order released before QBE filed its reply, the Court noted that Royal Bahamian violated this very same rule.  (DE# 110, § III.C.)

Because the Court showed leniency to Royal Bahamian in that order and did not strike its reply on the discovery motion, it will likewise not strike this portion of QBE's argument from its consideration.  However, the Court finds no need to allow Royal Bahamian the opportunity to file a sur-response on this distinction.  This is because the Court rejects this particular argument for the same reasons it concludes in §III.D.1 below (i.e., that the declaration incorporates section 718.111(11), Florida Statutes (2003)), that Royal Bahamian was obligated to insure windows and sliding glass doors.

These violations of the local rules make it more difficult to evaluate the competing motions and are irksome.  The parties are urged to follow all applicable local rules in the future.

### IV.     Discussion

#### a.  Applicable Legal Standards

This case was originally filed in the Circuit Court for the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, involves an insurance contract signed in Florida, and was removed to this Court based on diversity jurisdiction under 28 U.S.C. § 1332. (5/10/2010, DE# 1.)  Consequently, Florida substantive law and federal procedural rules apply.  *Lundgren v. McDaniel*, 814 F.2d 600, 605 (11th Cir. 1987).  *See also LaTorre v. Connecticut Mut. Life Ins. Co.*, 38 F.3d 538, 540 (11th Cir. 1994) ("Florida adheres to the traditional rule that the legal effects of terms of the insurance policy and rights and obligations of persons insured thereunder are to be determined by the law of the state where the policy was issued") (citing *Wilson v. Ins. Co. of N. Am.*, 415 So. 2d 754, 755 (Fla. 2d DCA 1982); *Insurance Co. of N. Am. v. Lexow*, 937 F.2d 569, 571 (11th Cir. 1991) ("In applying state law, a federal court must adhere to decisions of the state's intermediate appellate courts absent some persuasive indication that the state's highest court would decide the issue otherwise) (internal quotation marks and citations omitted)).

#### i.  Standard for Summary Judgment

Federal Rule of Civil Procedure 56(c) provides that summary judgment should be granted:

> . . . if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue of material fact and that the movant is entitled to judgment  as a matter of law.

The moving party bears the burden of meeting this standard.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  All evidence considered on motion for summary judgment must be "viewed in a light most favorable to the nonmoving party."  *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458 (11th Cir. 1994) (citing *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991).  A nonmoving party is

under no obligation to respond to a motion for summary judgment that is not properly supported with evidence.  *Adickes*, 398 U.S. at 160.

This does not mean a court is "constrained to accept all the nonmovant's factual characterizations and legal arguments."  *Beal*, 20 F.3d at 458-59.  Once the moving party has presented a properly supported motion for summary judgment, the nonmoving party cannot rely on the existence of a mere "scintilla of evidence" to avoid summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). *See also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S 574, 586 (1986) ("[T]he party opposing summary judgment must do more than simply show that there is some metaphysical doubt as to the material facts"); *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) ("Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action'") (quoting FED. R. CIV. P. 1).

To further refine the standard, Rule 56 mandates the entry of summary judgment, upon motion, "against a party who fails to make a showing sufficient to establish an element essential to his case on which he bears the burden of proof at trial."  *Schechter v. Georgia State Univ.*, 341 F. App'x 560, 562 (11th Cir. 2009) (citing *Celotex Corp.*, 477 U.S. at 322)).  Therefore, "[i]f no reasonable jury could return a verdict in favor of the nonmoving party, there is no genuine issue of material fact and summary judgment will be granted."  *Beal*, 20 F.3d at 458-59.  In sum:

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather it must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial.  If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

FED. R. CIV. P. 56(e)(2).  *Accord Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991).

### ii.  Construction of an Insurance Policy

The construction of an insurance policy is a question of law.  *Royale Green Condo. Ass'n, Inc. v. Aspen Specialty Ins. Co.*, No. 07-21404-CIV, 2009 WL 799429, at *2 (S.D. Fla. March 24, 2009) (citing *Strama v. Union Fidelity Life Ins. Co.*, 793 So.2d 1129, 1132 (Fla. 1st DCA 2001).  Insurance contracts are "construed in accordance with the plain language of the policies as bargained for by the parties."  *Prudential Prop. and Cas. Ins. Co. v. Swindal*, 622 So. 2d 467, 470 (Fla. 1993).  A basic premise [of Florida law is] that terms of an insurance contract must be given their plain, ordinary and generally accepted meanings viewed from the perspective of the average person."  *Adolfo House Distrib. Corp. v. Travelers Prop. and Cas. Ins. Co.*, 165 F. Supp. 2d 1332, 1340 (S.D. Fla. 2001) (citing *Union Am. Ins. Co. v. Maynard*, 752 So.2d 1266 (Fla. 4th DCA 2000)).

A court "should read each policy as a whole, endeavoring to give every provision its full meaning and operative effect."  *Auto-Owners Ins. Co. v. Anderson*, 756 So.2d 29, 34 (Fla. 2000).  If "a policy provision is clear and unambiguous, it should be enforced according to its terms whether it is a basic policy provision or an exclusionary provision."  *Garcia v. Federal Ins. Co.*, 969 So. 2d 288, 291 (Fla. 2007) (internal quotation marks and citation omitted).

While the plain language of an insurance contract is controlling, "ambiguous insurance policy exclusions are construed against the drafter and in favor of the insured."  *Id.*  If an ambiguity is found in an insurance contract, that ambiguity must be interpreted liberally against the insurer.  *Deni Assocs. of Fla., Inc. v. State Farm Fire & Cas. Ins. Co.*, 711 So.2d 1135, 1138 (Fla. 1998).  In fact, exclusionary clauses are

"construed even more strictly against the insurer than coverage clauses." *Anderson*, 756 So. 2d at 34.

Nevertheless, every difficulty in construing a contractual provision does not create an ambiguity. An insurance policy can be unambiguous despite also being complex and requiring a detailed analysis of its provisions to determine the scope and extent of coverage. *Garcia*, 969 So. 2d at 291. Only when "the relevant policy language is susceptible to more than one reasonable interpretation, one providing coverage and the [sic] another limiting coverage, [is] the insurance policy is considered ambiguous." *Anderson*, 756 So. 2d at 34. In order to find an insurance policy "ambiguous," a court must determine that "a genuine inconsistency, uncertainty or ambiguity in meaning remains after resort to the ordinary rules of construction." *Deni Assoc.*, 756 So. 2d at 1138.

### b. Insurance Fraud As An Affirmative Defense to Coverage

Fraud provisions in insurance contracts are enforceable under Florida law. *Bray & Gillespie IX, LLC v. Hartford Fire Ins. Co.*, No. 6:07-cv-326-Orl-DAB, 2009 WL 1513400, at *9 (M.D. Fla. May 27, 2009). The affirmative defense of fraud is "usually considered a jury question and is not ordinarily appropriate for summary judgment proceedings." *Public Health Trust of Dade County v. Prudential Ins. Co.*, 415 So. 2d 896, 897 (Fla. 3d DCA 1982). The purpose of a fraud provision is to discourage an insured from making misrepresentations in support of their insurance claim. *Bosem v. Commerce & Indus. Ins. Co.*, 35 So. 3d 944, 945 (Fla. 3d DCA 2010). Under Florida common law, a party alleging fraud typically must show "(1) a false statement of fact; (2) known by the defendant to be false at the time it was made; (3) made for the purpose of inducing . . . [that party] to act in reliance thereon; (4) action by the plaintiff in reliance on the correctness of the representations; and (5) resulting damage." *Nova Hills Villas*

12

*Condo. Ass'n, Inc. v. Aspen Specialty Ins. Co.*, No. 07-60939, 2008 WL 179878, at *3 (S.D. Fla. Jan. 21, 2008).

However, in the insurance contract context, "the traditional requirements of a fraud claim do not necessarily apply." *Id.* The law of this Circuit is clear that courts "will not require that an insurer demonstrate that it relied on the insured's misrepresentations when asserting a policy defense based on fraud; that a material fraud was perpetrated by an insured in pursuing an insurance claim is sufficient." *Michigan Millers Mut. Ins. Corp. v. Benfield*, 140 F.3d 915, 923 (11th Cir. 1998) (interpreting a Florida property insurance contract). *Accord Lopes v. Allstate Indem. Co.*, 873 So. 2d 344, 347 (Fla. 3d DCA 2004) ("[U]nder Florida law, if there is a willful false statement of a *material* fact, there is no requirement that an insurer show prejudicial reliance in order to enforce the contract provision") (italics in original).

While in some rare instances, where operable facts are uncontroverted, a party may obtain summary judgment on a fraud count, generally the "question of whether an insured has made a material misrepresentation is a question for the jury to determine." *Lopes*, 873 So. 2d at 347*; Cole Taylor Bank v. Shannon*, 772 So. 2d 546, 553 (Fla. 1st DCA 2000).

### c. Applicable Insurance Policy Provisions

Both parties agree on what portions of the insurance policy are applicable to their dispute and that these provisions must be interpreted in light of Royal Bahamian's condominium declaration. While there are many forms that comprise the entire policy, the pertinent forms are ISO[4] Form CP 00 17 04 02 and CP 01 91 01 04. The former is the policy's Condominium Coverage Form and the latter is a 2003 endorsement to the

---

[4] "ISO" is the abbreviation for the Insurance Services Office, which publishes these and other standard forms used by the insurance industry. *See Adolpho House*, 165 F. Supp. 2d at 1340 n.4 (S.D. Fla. 2001).

policy that re-defined the word "building" for coverage purposes.  These forms provide coverage for hurricane damage as follows:

### A. Coverage

We will pay for direct physical loss of or damage to Covered property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss

### 1. Covered Property

Covered Property, as used in this Coverage Part, means the type of property described in this Section, **A.1.**, and limited in **A.2.**, Property Not Covered, if a Limit of Insurance is shown in the Declarations for that type of property.

**a. Building,** meaning the building or structure described in the Declarations, including:

**(1)** Completed additions;

**(2)** Fixtures, outside of individual units, including outdoor fixtures;

. . .

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEAD READ IT CAREFULLY**

**FLORIDA CHANGES – CONDOMINIUMS**

. . .

**B.** The following provision applies to the Condominium Association Insurance:

Building section is replaced by the following:

**1.** Building, meaning the building or structure described in the Declarations, including:

**a.** Completed additions;

**b.** Fixtures, outside of individual units, including outdoor fixtures;

. .

**f.** Any of the following types of property contained within a unit, if your Condominium Association Agreement requires you to insure it:

(1) Your fixtures, improvements and alternations that are a part of the building or structure;

. . .

14

**g.** Fixtures, installations or additions, owned by unit-owners and located inside individual units:

**(1)** Initially installed in accordance with the original plans and specifications, or replacements of like kind or quality as those initially installed; or

**(2)** As existed at the time the unit was initially conveyed, if the original plans and specifications are not available.

**h.** Any other portion of the condominium property, if your Condominium Association Agreement requires you to insure it; and

(DE# 53-3, pp. 32, 45-46.)   Moreover, paragraph 2 of this same policy endorsement specifically lists several items that are not covered, such as floor coverings, electrical fixtures, appliances, air conditioners or heating equipment, and water heaters.

Royal Bahamian's condominium declaration provide in pertinent part that:

11. <u>Maintenance of Units and Limited Common Elements</u>. All maintenance, repairs and replacements performed in or to any unit, including the limited common elements appurtenant thereto, whether structural or nonstructural, ordinary or extra-ordinary, shall be performed at the unit owner's sole cost and expense. Such maintenance, repairs and replacements shall include, without limitation, maintenance, repair and replacement of screens (including screens of screened enclosures), windows, sliding glass doors, access doors, plumbing and electrical fixtures and outlets within the unit, appliances, air conditioning and heating equipment, carpets and other floor coverings, wall treatments, all interior surfaces and the entire interior of the unit lying within the boundaries of the unit or the limited common elements and any personal property belonging to the unit owner. The unit owner shall maintain the floor and interior surfaces of the balcony attached to his condominium unit at his own expense. Every owner shall promptly perform all maintenance and repair work within his condominium unit which, if omitted, would affect the condominium in its entirety or in a part belonging to other owners and the unit owner is expressly responsible for the damages and liability which his failure to do so may engender.

12. <u>Maintenance of Common Elements</u>.
…

B. <u>Unit Owner Responsibility</u>. The obligation to maintain and repair any equipment, fixtures or other items of

property which service a particular unit or units shall be the responsibility of the applicable unit owners, individually, and not the Association, without regard to whether such items are included within the boundaries of the units or not.

...

E. Private Unit Owner Insurance. Each individual unit owner shall be responsible for purchasing, at his own expense, liability insurance to cover accidents occurring within his own unit, and for purchasing insurance upon his own personal property, and living expense insurance, and such insurance, where applicable, shall contain the same waiver of subrogation, if available, as referred to in paragraph F hereinafter.

. . .

15.     Insurance

A. Casualty Insurance.

(1)     Purchase of Insurance. The Association shall obtain fire and extended coverage insurance and vandalism and malicious mischief insurance, insuring all of the Insurable Improvements within the Condominium Project, including personal property owned by the Association in and for the interest of the Association, all unit owners and their mortgagees, as their interests may appear, in a company acceptable to the standards set by the Board of Directors of the Association, in an amount equal to the maximum insurable replacement value, as determined annually by the Board of Directors of the Association. The premiums for such coverage and other expenses in connection with said insurance shall be paid by the Association and charged as a common expense.

E.     Private Owner Unit Insurance.  Each individual unit owner shall be responsible for purchasing, at his own expense, liability insurance to cover accidents occurring within his own unit, and for purchasing insurance upon his own personal property, and living expense insurance, and such insurance where applicable, shall contain the same waiver of subrogation, if available, as referred to in paragraph F heafter.

(DE# 53-4.)

The parties agree that these documents obligate the Individual Royal Bahamian unit owners to maintain and repair screens, windows, and sliding glass doors.  (DE# 55, § 1.B.)

### d.  Coverage (Or Not) Under the Policy

Both parties have moved for summary judgment on the issue of whether the insurance policy  covers damage to windows and sliding glass doors.  Whether Royal Bahamian is entitled to coverage for windows and sliding glass doors requires consideration of two different questions.

### i.  Royal Bahamian's Insurance Obligations Under the Condominium Declaration

First, QBE argues that in order for these items to be covered under the policy, Royal Bahamian must have been required to purchase such coverage under its governing documents.  QBE's assertion appears to be based on its belief that only paragraphs B.1.f, B.1.g., and B.1.h of the policy endorsement are at issue.  The Court finds that these paragraphs indeed contain such a requirement.  Royal Bahamian's motion for summary judgment also relies on paragraph B.1.b as well -- and this paragraph unambiguously does not contain the requirement.  Nonetheless, and as described below, because Royal Bahamian is not entitled to summary judgment based upon paragraph B.1.b, the Court must determine whether or not this obligation exists.

It is certainly true that Royal Bahamian's condominium declaration does not expressly require that it maintain insurance over windows and sliding glass doors. Moreover, QBE accurately points out that Royal Bahamian's declaration explicitly obligates individual unit owners to perform all "repairs and replacements . . . without limitation" to windows and sliding glass doors "at the unit owner's sole cost and expense."  (DE# 53-4, ¶ 11.)  According to QBE, this paragraph prevents the Court from construing Royal Bahamian's declaration as obligating it to insure these items.  (DE# 53, § 2.)  On the other hand, Royal Bahamian contends that this paragraph is separate from, and irrelevant to, its insurance obligations.   Royal Bahamian contends that the

maintenance obligation is in one paragraph but the insurance obligation is found elsewhere.   (DE# 91, § 3.)

In support of its argument, Royal Bahamian relies on Senior District Judge Daniel T.K. Hurley's opinion in *Mayfair House Association, Inc. v. QBE Insurance Corporation*, No. 07-80628, 2008 WL 4097663, at *7 n.3 (S.D. Fla. Aug. 29, 2008).[5]  In that opinion, Judge Hurley analyzed the same insurance policy at issue here and evaluated a condominium declaration that similarly required the association to insure "all insurable improvements" and that "[t]he UNIT OWER shall maintain, repair and replace at his own expense all portions of his unit, including but not limited to all doors, windows, glass, screens."  (DE# 91-1, ¶ 10.3.)  *Id.* at *4.  Notwithstanding the existence of the similar repair and replacement provision, Judge Hurley concluded that the association in that case was obligated to insure windows and glass sliding doors.  *Id.* at *7.

In making his determination, Judge Hurley relied primarily on two facts.  First, Judge Hurley noted that the declaration in that case specifically excluded certain items from the association's insurance obligations and that windows and sliding glass doors were not among these exceptions.  *Id.* at 6.  Royal Bahamian's declaration contains no such exclusion, however.  Therefore, I cannot adopt that reasoning because the key document being analyzed is different.  Second, Judge Hurley relied on section 718.111(11),[6]  Florida Statutes (2003), which allocated insurance responsibilities between condominium associations and individual unit owners.  Judge Hurley noted that

---

[5]       This Court is not bound by Judge Hurley's opinion.   "The general rule is that a district judge's decision neither binds another district judge nor binds him, although a judge ought to give great weight to his own prior decisions."  *McGinley v. Houston*, 361 F.3d 1328, 1331 (11th Cir. 2004).  Moreover, there are important factual distinctions between the *Mayfair* case and this case. I, however, do agree with much of Judge Hurley's reasoning and will appropriately weight this in this report and recommendation.

[6]       The opinion actually states the statute is 71**6**.111(11).  However, both in 2003 and today, there existed no such numbered statutory section.   Instead, chapter 716 deals with the escheatment of unclaimed money.   Moreover, a review of the quoted statutory language in the opinion clearly reveals that the opinion was analyzing section 71**8**.111(11).

this statute contains a list of items specifically excluded from an association's insurance obligations and that windows and sliding glass doors were not among these exclusions.

Though it does not exclude windows and glass sliding doors, Section 718.111(11) likewise does not explicitly identify an *association* as the party responsible for insuring these items.   However, Royal Bahamian has pointed out several administrative decisions by the Florida Department of Business and Professional Regulation Division of Florida Land Sales, Condominiums, and Mobile Homes (the "Division") which specifically identify an association as the party responsible for insuring windows and sliding glass doors.  In particular:

> The legislature intended to make condominium property casualty insurance contracts uniform across the state and make it clear which items were the responsibility of the association to insure and which were the responsibility of the unit owner.   Beginning January 1, 2004, all Florida condominium associations were responsible for adequately insuring the replacement costs of buildings, the components of building structures, **which includes the <u>windows</u>, doors, screens, and <u>sliding glass doors</u> that were initially installed when the building was built even where these are designated as inside the unit's boundaries.** § 718.111(11)(a)-(c).

*In re Petition for Declaratory Statement Plaza East Ass'n*, DS 2005-055, Docket No. 2005059934, ¶ 23 (January 13, 2006) (emphasis added)..   *Accord In re Petition for Declaratory Statement Molokai Villas Condo. Ass'n, Inc.*, DS 2006-028, Docket No. 2006035317, ¶ 35 Aug. 28, 2006); *In re Petition for Declaratory Statement Hillsboro Imperial Condo. Ass'n, Inc.*, DS 2007-050, Docket No. 2007054089.

In fact, one of these decisions, *Molokai*, specifically held that, despite a paragraph in a condominium declaration that made it the unit owner's responsibility to "maintain, repair, and replace . . . without limitation . . . screens, windows, entrance door(s), and all other doors," the **association** was obligated to insure and pay for repair and replacement of these items due to hurricane damage.  DS 2006-028 at ¶¶ 15, 70.

The Division stated that section 718.111(11) "controls over any provision to the contrary in a declaration of condominium" and is "deemed to apply to every residential condominium in the state, regardless of the date of its declaration." *Id.* at ¶ 37.

I find that Royal Bahamian's condominium declaration should therefore be construed to include an obligation to insure windows and glass sliding doors against hurricane damage.[7]   Judge Hurley's conclusion involved a similar lack of an explicit exclusion of this coverage in a similar declaration and the lack of an explicit exclusion in section 718.111(11).   I find Judge Hurley's analysis on this point persuasive and my conclusion is certainly supported by the clear lack of an explicit exclusion of an obligation to insure these items in Royal Bahamian's declaration and in the statute.

However, I find *most* persuasive the Division's interpretation that this statute contains such an obligation for the association.[8]   *See Sans Souci v. Division of Fla. Land Sales and Condos., Dep't of Bus. Regulation*, 421 So. 2d 623, 626 (Fla. 1st DCA 1982) (interpreting this statute "is a task for which the Division, given its regulatory responsibility over condominiums, has special expertise.   Agency determinations with regard to the statute's interpretation and applicability will normally be accorded great deference, unless there is a clear error or conflict with the intent of a statute").   Moreover, this is the only reasonable construction of the declaration given that the declaration itself provides that it should be "construed . . . in accordance with Chapter 718 of the Florida Statutes as amended."  (DE 53-4, ¶ 29.)  *See Seabreeze Restaurant, Inc. v. Paumgardhen*, 639 So.2d 69, 71 (Fla. 2d DCA 1994) ("'An interpretation of a

---

[7]      Of course, just as in *Mayfair*, my opinion is limited to situations where the items were initially installed when the building was built. As in *Mayfair*, QBE did not claim that the windows and sliding glass doors were not installed when the building was built.   However, this limitation does not apply to paragraph B.1.g, which, when read in conjunction with the statute, served to extend this obligation to "replacements of like kind or quality as those initially installed."  (DE# 53-3.)

[8]      I find QBE's attempts to distinguish the Division's opinions to be unpersuasive.  While the facts involved were not identical, the Division's legal conclusions with regard to the statute's scope and applicability are clear and pertinent to the necessary analysis here.

contract which gives a reasonable, lawful and effective meaning to all of the terms is preferred to an interpretation which leaves a part unreasonable, unlawful or of no effect'") (quoting *Herian v. Southeast Bank, N.A.*, 564 So.2d 213, 214 (Fla. 4th DCA 1990)).

### ii. Covered Property Under the Insurance Policy

In its Motion, Royal Bahamian relies on paragraphs B.1.b, B.1.f., B.1.g and B.1.h of the applicable insurance policy endorsement.   (DE# 55, pp. 5, 7.)  Royal Bahamian believes that windows and sliding glass doors constitute fixtures and therefore are covered property under paragraphs B.1.b, B.1.f and B.1.g.   In the alternative, Royal Bahamian also contends that windows and sliding glass doors constitute some "other portion" of the condominium property and are therefore covered property under paragraph B.1.h.

QBE takes the contrary position, arguing that none of these paragraphs support the existence of coverage for windows and sliding glass doors.  QBE contends that windows and sliding glass doors do not constitute "fixtures" under Florida law.  Moreover, while QBE does not specifically discuss paragraph B.1.h, its submissions do provide argument that is clearly in opposition to Royal Bahamian's reliance on Judge Hurley's opinion in *Mayfair* as to this paragraph.  (DE# 112.)

While the parties refer to and discuss these paragraphs in their filings in a general, broad way, neither Royal Bahamian nor QBE clearly and separately provides an analysis that specifically discusses whether coverage is appropriate as to each paragraph.  As each of these paragraphs has different requirements for coverage to be effective, I need to make a paragraph-by-paragraph analysis.

### 1.  B.1.b

Paragraph B.1.B of the endorsement to the insurance policy includes as covered property "Fixtures, outside of individual units, including outdoor fixtures."  At the risk of stating the obvious, this paragraph therefore unambiguously gives the location of covered fixtures -- *outside* the unit.

While the parties sometimes refer to the windows and glass sliding doors as being "exterior," the parties have not provided the Court with any competent evidence demonstrating that the windows and sliding glass doors should be considered to be outside or inside a unit.  It is not the Court's role to guess as to whether this key fact necessary for coverage exists.[9]  It is the parties' responsibility, not the Court's, to sift through the record and to make necessary and appropriate arguments.  *See, e.g., United States v. Dunkel*, 927 F. 2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs"); *United States v. Zannino,* 895 F.2d 1, 17 (1st Cir. 1990) ("Judges are not expected to be mindreaders. Consequently, a litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace") (internal quotation marks omitted).

In *Mayfair*, 2008 WL 409763, at *5, Judge Hurley concluded that the windows and sliding glass doors at issue in that case "are plainly encompassed within the

---

[9]     The parties agree on Royal Bahamian's obligation to repair and replace windows and sliding glass doors as provided in ¶11 of the declaration.  This paragraph covers such items "within the unit."  It therefore appears likely that the parties *might* agree that the disputed windows and glass sliding doors should be considered as "inside" the units.  However, Royal Bahamian is claiming coverage under multiple paragraphs, some of which apply only if it is established that a fixture is inside or outside of a unit.  Moreover, Royal Bahamian also appears to take the position that these items must necessarily be *outside* the unit because these items are condominium property.  (DE# 91, § III.)

    The Court cannot simply guess that this is an undisputed fact where doing so would, for instance, entitle QBE to summary judgment on paragraphs that Royal Bahamian contends provides coverage.  As per Chief Judge Moreno's August 24, 2010, order, the parties' time for filing any summary judgment materials expired on September 13, 2010.  Consequently, the parties cannot further attempt to clarify their positions on the inside-outside issue at this summary judgment stage.

boundaries of the individual condominium 'unit.'"  This conclusion, however, was based upon a provision in the Mayfair declaration that specifically defined these items as being within a unit.  *Id.*  As noted by Royal Bahamian in its response to QBE's motion for partial summary judgment, Royal Bahamian's own declaration does not clarify this issue. (DE# 91, § III.)

Given the contractual relevance of the inside-outside distinction and the parties' collective failure to submit competent evidence on this issue, I respectfully recommend that the District Court deny both parties' summary judgment motions concerning paragraph B.1.b. of the insurance policy.

### 2.  B.1.f

Paragraph B.1.f of the endorsement to the insurance policy includes as covered property "fixtures" "contained within a unit."  I must respectfully recommend that both parties be denied summary judgment as to paragraph B.1.f for the same reason as I did for paragraph B.1.b.  The parties have not directed the Court to any competent evidence as to whether the windows and sliding glass doors are located "within" the units.

### 3.  B.1.g

Paragraph B.1.g of the endorsement to the insurance policy clearly provides coverage only where a fixture is "owned by unit-owners and located inside individual units."  In its response to QBE's motion for partial summary judgment, Royal Bahamian took the position that, unlike in *Mayfair*, "Plaintiff's screens, windows, and sliding glass doors are part of the **condominium** property."  (emphasis supplied). (DE# 91, § 3.) Consequently, Royal Bahamian is not (and could not be) entitled to summary judgment under paragraph B.1.f.

Moreover, even if this were not Royal Bahamian's position, summary judgment would still be inappropriate for either party.  Like paragraph B.1.b, paragraph B.1.g also unambiguously applies only to fixtures in a certain location -- inside individual units.

These fixtures are presumably all either outside or inside of individual units.[10] Therefore, Royal Bahamian could not possibly be simultaneously entitled to summary judgment on *both* B.1.b. (fixtures outside of units) and B.1.g (fixtures inside individual units), as it contends.

For all the reasons above, I respectfully recommend that the District Court deny both parties' summary judgment motions as to paragraph B.1.g.

### 4.  B.1.h.

Paragraph B.1.h of the endorsement to the insurance policy provides coverage for "Any other portion of the condominium property, if your Condominium Association Agreement requires you to insure it."  (DE# 53-3.)  Consequently, the parties' failure to specify the location of the windows and glass sliding doors is not a bar to the Court's consideration of whether coverage exists under *this* paragraph (which does not specify that the property is inside of, or outside of, a unit).  Moreover, as I have already determined that Royal Bahamian was obligated to insure windows and glass sliding doors, the only question remaining is whether these items constitute some "other portion" of the condominium property.

Royal Bahamian relies on Judge Hurley's *Mayfair* opinion for coverage under this paragraph.  (DE# 55, §I.B.)   In *Mayfair*, Judge Hurley concluded that windows and glass sliding doors constituted "some 'portion of the condominium property' which the Association is required to insure under its general obligation to insure the 'building . . . including all of the units and common elements' imposed at ¶ 13.4 of the Condominium By-Law, and as such fall[s] within the catch-all definition of a covered 'building' component set out at ¶ B.1.h of the policy endorsement at issue."  2008 WL 4097663, at *7.  In making this determination Judge Hurley construed the Mayfair declaration in

---

[10]     As noted above in section III.D.ii.1, the record is bare as location in this important regard.

conjunction with the definition of "condominium property" found in section 718.103(13), Florida Statutes.[11]

Judge Hurley focused his attention on the language in the Mayfair declaration which provided that the association was obligated to insure "the building and all other insurable improvements upon the land, including all the units and the common elements, and all personal property as may be owned by the Association." The insurer in that case (coincidentally, also QBE) argued that the types of insurable interests covered by this provision were limited to the personal property owned by the association. Judge Hurley rejected this and instead determined that the ownership provision modified and limited only personal property. From there, Judge Hurley noted that windows and sliding glass doors were not specifically excluded from the association's insurance obligations under its declaration or excluded by section 718.111 (as were several other items).

I agree with Judge Hurley's reasoning. The general rule is that insurance contracts are to be interpreted from the point of view of an ordinary man. *Adolpho House*, 165 F. Supp. 2d 1340. Just as in this case, the condominium declaration in *Mayfair* was incorporated into the insurance policy and therefore was in pertinent portion itself part of the insurance contract. It takes little construction to conclude that doors and windows are a "portion of the condominium property," whether technically individual unit or common property and surely an ordinary man would understand that construction.

However, Royal Bahamian's insurance obligations as described in its declaration are different. Royal Bahamian's policy provides only that it must insure "all of the Insurable Improvements within the Condominium Project, including personal property owned by the Association." Royal Bahamian urges that this difference is not substantive

---

[11]     This statute has in pertinent part remained unchanged since the applicable 2003 policy endorsement became part of the policy. *See* Amendment Notes to §718.103, Fla. Stat. Ann. (West 2010).

and that what matters is that in both cases the declarations obligated the association to insure all insurable property.  (DE# 91, § 2.)

QBE does not disagree that this provision should be construed in light of the skill and experience of an ordinary man.  Instead, QBE points to a notice sent by the Royal Bahamian Board of Directors to unit owners.  This notice informs the owners that the association received inquiries after Hurricane Wilma regarding what damages the association was responsible for repairing.   (DE# 53, ¶ 10.)  QBE contends that this notice demonstrates that Royal Bahamian's board, which is presumed to be comprised of ordinary persons, understood that the individual owners were required to repair windows and sliding glass doors  under the declaration.  (DE# 112, pp. 2-3.)

Royal Bahamian admits that it sent this notice, but explains only that the document speaks for itself.   (DE# 91, p. 2.)  The notice appears to be a summary of paragraphs 8, 9, and 11 of the declaration.  It states in pertinent part:

> AMENDED AND RESTATED DECLARATION OF CONDOMINIUM, PAGE 8 AND 9, PARAGRAPH 11, MAINTENANCE OF UNITS AND LIMITED COMMON ELEMENTS:
>
> ALL MAINTENANCE, REPAIRS AND REPLACEMENTS PERFORMED IN OR TO ANY UNIT, INCLUDING THE LIMITED COMMON ELEMENTS APPURTENANT THERETO, WHETHER STRUCTURAL OR NONSTRUCTURAL, ORDINARY OR EXTRAORDINARY, SHALL BE PERFORMED AT THE UNIT OWNER'S SOLE COST AND EXPENSE. SUCH MAINTENANCE, REPAIRS AND REPLACEMENTS SHALL INCLUDE, WITHOUT LIMITATION, MAINTENANCE, REPAIR AND REPLACEMENT OF SCREENS (INCLUDING SCREENS OF SCREENED ENCLOSURES), WINDOWS, SLIDING GLASS DOORS, ACCESS DOORS, PLUMBING AND ELECTRICAL FIXTURES AND OUTLETS, ETC. ... (SEE ATTACHED COPY OF THE PARAGRAPH IN ITS ENTIRETY.)

SHOULD ANY UNIT OWNER HAVE ANY FURTHER QUESTIONS AFTER READING THE INFORMATION, PLEASE CONTACT THE OFFICE AT (305) 949-5286.

(DE# 53, ¶ 10.)  Royal Bahamian also concedes that prior to speaking to an attorney, it did not believe that the windows and sliding glass doors of individual units were covered by its insurance policy.  (*Id.* at ¶ 4; *See generally* Royal Bahamian's response in which it does not dispute this fact, DE# 91.)

Notwithstanding that the declaration language is different and Royal Bahamian's admittedly different initial understanding of its rights under the policy, I conclude that Royal Bahamian is entitled to summary judgment as a matter of law for coverage of windows and sliding glass doors under paragraph B.1.h of the endorsement to the insurance policy.

The parties have not provided the Court with any cases directly supporting their favored constructions of this paragraph.  However, I conclude that an ordinary man would understand "[a]ny other portion of the condominium property" to include windows and sliding glass doors.  Similarly, an ordinary man would also understand that these items are insurable.  *See also* § 718.111, Fla. Stat. (2003) (requiring that an association insure these items).

The slight difference in the declaration's language is of no import here.  As discussed above, I have already determined that under this language Royal Bahamian was obligated to insure windows and sliding glass doors.  Therefore, under the unambiguous language of paragraph B.1.h, Royal Bahamian is entitled to coverage of its sliding glass doors and windows because an ordinary person would consider them a "portion of the condominium property" and Royal Bahamian was obligated to insure them.

Consequently, I respectfully recommend that the District Court grant Royal Bahamian summary judgment on the coverage issue for windows and sliding glass doors under paragraph B.1.h of the endorsement to the insurance policy, and deny QBE summary judgment.[12]

### e.  QBE's Claim of Concealment, Misrepresentation or Fraud

Royal Bahamian contends that it is entitled to summary judgment on QBE's ninth affirmative defense (*i.e.*, that the insurance policy is void because Royal Bahamian fraudulently deceived it by submitting a claim for pre-existing damages, damages it knew were not covered under its policy, and grossly inflating the amount of damage to covered property).  Royal Bahamian believes that there is no evidence that it "misrepresented or concealed any material facts with the intent to defraud or deceive QBE."  (DE# 55, § 2.D.)  QBE, according to Royal Bahamian, can  point only to instances where the parties legitimately disagree over what constitutes covered property, the causation of damage to certain property and a dispute over the amount of damage to covered property both agree was damaged by Hurricane Wilma.  (*Id.* at §§ 2.A-D.)

QBE argues in opposition that there are many facts which, if presented to a jury, would support a verdict in its favor on its ninth affirmative defense.  I agree and therefore respectfully recommend that the District Court deny Royal Bahamian summary judgment concerning QBE's ninth affirmative defense.

---

[12]     If adopted by the District Court, this summary judgment recommendation does not mean that Royal Bahamian is entitled to a monetary judgment or even a judgment on liability for its breach of contract claim.  Instead, it merely means that an *issue* has been resolved in its favor.  It still must confront QBE's affirmative defenses and, if successful, establish damages as prerequisites to recover a plaintiff's verdict.

Throughout its response to Royal Bahamian's motion, QBE points to many facts (and corresponding record evidence) from which a jury could conclude that Royal Bahamian intentionally concealed material information regarding its insurance claim.[13]

As outlined by QBE, there are several incidents where there is evidence suggesting Royal Bahamian either failed to provide QBE with information to which QBE was entitled or provided information that was incorrect.

For instance, Royal Bahamian waited until nearly four years after Hurricane Wilma to submit its proof of loss, and even then failed to submit a complete one.  (DE# 93, § II.B.)  In response to questioning at deposition about this proof of loss, Royal Bahamian's corporate representative noted that there was additional damage that had not been included.  (DE# 94-2, pp. 64-65.)  Moreover, there is evidence that on multiple occasions Royal Bahamian waited long periods of time to respond to information requests and failed to show up for an examination under oath regarding its claim.  (DE# 94-1, pp. 197-207.)  Even as late as August 20, 2010, approximately a year after Royal Bahamian submitted its proof of loss including windows and sliding glass doors, Robert Klein, a member of Royal Bahamian's board of directors, gave testimony suggesting that Royal Bahamian did not actually believe windows and sliding glass doors were covered under its insurance policy.  (DE# 94-8, pp. 94-95.)

QBE pointed to deposition testimony suggesting that any damage to the windows was caused by lack of maintenance and not Hurricane Wilma.   Royal Bahamian's corporate representatives acknowledged that the board minutes from as far back as the year 2000 indicate that gaskets around multiple unit windows were rotting, thereby allowing rain to seep inside the building.  (DE# 94-1, pp. 83-85.)  QBE points out an

---

[13]     This conclusion is in no way intended to suggest that I have formed an opinion one way or the other on this issue.  Because this is a summary judgment motion, I must view the facts in a light most favorable to QBE and to resolve all reasonable doubts in QBE's favor.  *Information Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002).

instance where it appears Royal Bahamian's corporate representative stated that virtually all 164 units suffered damage, but then one of QBE's own board members stated that his unit suffered no damage. (DE# 94-8, p. 11.)  This same board member also stated that after Hurricane Wilma had passed, he traveled around the condominium's perimeter and saw only about 8 to 12 units out of 164 total units with broken windows or glass.  (*Id.* at p. 12.)

Admittedly, the evidence QBE presented to the Court does not unquestionably support its narrative of fraud and deceit and concealment.  For instance, QBE states that Royal Bahamian's corporate representative (on page 138 of her deposition) claimed all 164 units were damaged by Hurricane Wilma, but that later a board member testified his unit was never damaged.  (DE# 94-1; 94-8, p. 11.)  The Court's own review of this page indicates that what the representative actually said is not entirely clear and could be interpreted differently.

However, the precise meaning of statements such as these and the reasons behind Royal Bahamian's tardiness in complying with information requests is for a jury to decide.  In other words, these are disputed issues of material fact.  If QBE is able to convince the jury, for instance, that Royal Bahamian knowingly claimed damage to all 164 units when it knew all along that this was not true, a jury could find in its favor on its ninth affirmative defense. But these are inferences to be derived from the evidence and it is not my place to now make those inferences.

## V.    Conclusion

I respectfully recommend that the District Court grant Royal Bahamian summary judgment on the coverage issue for windows and sliding glass doors under paragraph B.1.h of the endorsement to the insurance policy.  I also respectfully recommend that Royal Bahamian's motion be denied in all other respects and that QBE's motion be denied.

## VI.    Objections

Pursuant to 28 U.S.C. § 636(b)(1) and Local Magistrate Rule 4(b), the parties have fourteen (14) days to serve and file written objections, if any, with the Honorable Federico A. Moreno, Chief United States District Judge.  Each party may file a response to the other party's objection within 14 days of being served with the objection.  Failure to timely file objections shall bar the parties from a *de novo* determination by the Chief District Judge of an issue covered in the report and bar the parties from attacking on appeal the factual findings contained herein.  *RTC v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993) (citing *LoConte v. Dugger*, 847 F.2d 745, 749-50 (11th Cir. 1988), *cert. denied,* 488 U.S. 958).

RESPECTFULLY RECOMMEND, in Chambers, in Miami, Florida, this 17th day of September, 2010.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
The Honorable Federico A. Moreno
All counsel of record