UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.: 10-21511-MORENO/GOODMAN

ROYAL BAHAMIAN ASSOCIATION, INC.,

    Plaintiff,

v.

QBE INSURANCE CORPORATION,

    Defendant.

_____/

**ORDER ON PLAINTIFF'S *DAUBERT* MOTION REGARDING OPINIONS AND TESTIMONY OF DANIEL HEYER**

This matter is before the Court on Plaintiff's *Daubert* Motion Regarding Opinions and Testimony of Daniel Heyer (DE# 80), the Response of Defendant, QBE Insurance Corporation ("QBE") (DE# 109), and the Reply of Plaintiff, Royal Bahamian Association, Inc. ("Royal Bahamian") (DE# 124).

**I.    PROCEDURAL BACKGROUND**

The Court held an evidentiary hearing on October 15, 2010. (DE# 143.) QBE's proposed expert, Daniel Heyer, testified at the hearing. Both counsel for QBE and Royal Bahamian questioned Mr. Heyer, who brought to court for demonstrative purposes the "WinDō" device which is at the core of Plaintiff's challenge.

In the "conclusion" section of its motion, Royal Bahamian asked the Court to schedule a "voir dire" examination of Mr. Heyer in order to "vet the unreliability of the Heyer methodology" concerning the WinDō device. This relief has already been provided in the evidentiary hearing, so this portion of Royal Bahamian's motion is denied as moot.

Although not expressly mentioned in the conclusion/relief section of the motion, Royal Bahamian, in the argument section of its motion, also asks the Court, "in the performance of its gatekeeeping function," to "not allow Heyer's WinDō-generated opinions to reach a jury."

For the reasons outlined below, the Court will also deny the substantive portion of Plaintiff's motion. However, like all of this Court's rulings on the *in limine* motions, this ruling is a preliminary one and may, of course, be revisited by Chief U.S. District Judge Federico A. Moreno, who will be presiding over the trial, should the evidence at trial materially differ from the Parties' predictions or if the factual and legal issues under consideration significantly change.

At bottom, Plaintiff's challenge to QBE's use of Mr. Heyer as an expert witness relates more to the weight of his proposed opinion testimony rather than to its admissibility. As outlined below, Mr. Heyer's use of this device, a digital measuring tool which is similar to a level and which assesses the existence, type and scope of distortion or deformation in door and window frames, is sufficient to withstand a *Daubert*[1] challenge. Plaintiff may seek to expose perceived problems with Mr. Heyer's use of the WinDō device during cross-examination, including its lack of peer review. The purported problems, however, are insufficient to justify the complete exclusion of all testimony based on the WinDō device or a more-sweeping Order preventing Mr. Heyer from providing at trial any expert opinion testimony at all.

### I.   FACTUAL BACKGROUND

This case is one of several actions in this district relating to damages allegedly caused by Hurricane Wilma in October 2005. *E.g., Isola Condo. Assoc., Inc. v QBE Ins. Corp.,* Case 08-21592-CIV-GRAHAM/TORRES.

Royal Bahamian is a condominium association charged with managing two eight-story buildings with 164 total units located in North Miami Beach, Florida. (DE# 56, ¶ 1.) Approximately four years after Hurricane Wilma, Royal Bahamian submitted a sworn proof of loss to QBE claiming damages of $8,475,190.75.

---

[1] *Daubert v. Merrell Dow Pharms. Inc.,* 509 U.S. 579 (1993).

Royal Bahamian alleges to have calculated this amount based upon the opinions of experts it hired for the purpose of assessing the claimed damage. (*Id.* at ¶ 17.)  QBE denied Royal Bahamian's claim on May 5, 2010, approximately one month after Royal Bahamian filed its lawsuit. (*Id.* at ¶¶ 20-21.)

### *Daniel Heyer*

QBE retained Daniel Heyer, of EFI Global ("EFI"), to assist in the evaluation of Plaintiff's claim.  Mr. Heyer is a registered Professional Engineer in fourteen (14) states, including Florida, and has been working in the engineering field since 1971.  During his 38-year engineering career, he has specialized in wind damage and evaluated more than 100 high-rise structures for storm damage.  He is currently Vice-President of Engineering and a civil/structural engineer at EFI.

Mr. Heyer's extensive experience evaluating wind-related damage includes personally evaluating more than one thousand (1,000) commercial, residential and industrial structures in the United States and the Caribbean following thirty hurricanes, including Hurricane Wilma, and also evaluating structures for damages caused by 50 – 60 tornadoes and 2 earthquakes. (DE# 109-8.)  Of particular note, Mr. Heyer evaluated damage caused by Hurricane Andrew in South Florida for 6 to 8 months and was lead testifying engineering expert concerning Hurricane Katrina-caused damage to the Lousiana Superdome in New Orleans.  Mr. Heyer has also authored and co-authored several articles regarding structural matters, including window and door damage, and provided expert opinion testimony on these types of damages in both depositions and trials.

Mr. Heyer inspected Royal Bahamian's buildings in early 2010 as a member of a team evaluating Royal Bahamian's September 17, 2009, claim for $8.47 million in Hurricane Wilma damage. (DE# 109.)  During discovery, QBE listed Mr. Heyer both as a fact witness and an expert witness.  QBE first listed Mr. Heyer as a fact witness in its May 28, 2010, Initial

Disclosures. It provided Mr. Heyer's file to Plaintiff's counsel on July 9, 2010, and formally disclosed him as an expert on August 9, 2010. (*Id.*) Plaintiff never took Mr. Heyer's deposition.

Royal Bahamian does not challenge Mr. Heyer's credentials, experience or expertise. Likewise, it does not affirmatively contend that his use of the WinDō device is unreliable or improper. Instead, its motion argues that his testimony should be excluded because his WinDō device is unknown and that Royal Bahamian and an expert it retained were unable to locate any articles or other information in the public domain about the device.[2]

Royal Bahamian's *Daubert* motion hinges on Mr. Heyer's use of the WinDō device, a tool which Mr. Heyer developed and which he considers proprietary (Mr. Heyer has submitted the device to the United States Patent and Trademark Office for patent protection). Plaintiff argues that Mr. Heyer should not be permitted to offer expert opinion testimony because the WinDō device has not been peer tested, has not been discussed in professional engineering publications, has not been accepted in the scientific community, and is, in effect, unknown to the professional engineering community. Therefore, Royal Bahamian argues, both it and the jury would be forced to merely take Mr. Heyer "at his word" that the device allows an accurate measurement of deflection and whether the deflection is inward or outward. (DE# 80, p. 4.)

### *Explanation of the WinDō Device*

In response, QBE explained that the device is a calibrated straight-edge which can measure the degree and direction of bowing of window and door frames. When in use, the device is calibrated against a steel straight edge – a recognized standard in the engineering community – three times per day. The device can be adjusted from three to ten feet in length and is calibrated each time the length is changed. According to QBE, the device is actually more effective and more accurate than a standard straight edge used to check for bowing

---

[2] Plaintiff attached an expert's affidavit to its *Daubert* motion. This affidavit, however, merely asserts that the expert, a structural engineering consultant with expertise in evaluating structural performance failures and investigating hurricane-damaged structures, could not find any reference to the device and that he personally had never heard of it. (DE# 80-3.)

because it has a digital gauge that precisely measures the direction and amount of bowing a frame is experiencing. (DE# 109, p. 4.)

At the evidentiary hearing, Mr. Heyer brought the digital gauge, the WinDō device and a calibration bar. Mr. Heyer demonstrated the device and the gauge and answered questions from counsel and the Court.

Mr. Heyer testified at the evidentiary hearing that he has visually examined door and window frames as part of his regular work throughout his entire 38 year career, but before he developed the WinDō device he used straight edges and a level when determining whether a window or door was deformed or had moved in its frame. Mr. Heyer explained that the straight edge is reliable and has been used by him and other forensic engineers for many years. Mr. Heyer added that he has qualified as an expert witness using a straight edge in 80 to 90% of the cases he has worked on over the past 38 years.

Mr. Heyer also explained that when a level is placed on a door frame, because of its perfectly straight nature, any deformation in the frame will reveal itself as a gap between the level and the door frame surface. A forensic engineer using a straight edge then measures this gap, oftentimes simply by guessing its depth. Measuring the gap can be done with a tape measure or ruler – but necessarily involves a certain amount of guesswork nonetheless because of the small distances being measured.

Although Mr. Heyer acknowledged that the forensic engineering community accepts the use of a straight edge even with its inherent guesswork and estimation, in his professional opinion the WinDō device is actually more accurate because there is a dial indicator to measure the space and a digital readout from a calibrated gauge. Phrased differently, Mr. Heyer's device removes the estimating and guesswork involved in the more-traditional method of measuring the bowing of frames with tape measures and/or rulers.

Mr. Heyer testified that the device, with the digital gauge, can measure deviations within millionths of an inch. The gauge itself, which measures the deformation at the mid-point, is not

5

new. The gauge is of a type that has been used for the past 20-30 years by other professionals who also require accurate measurements, such as machinists, who typically use it to set up lathes, among other purposes. Moreover, the digital gauge is manufactured by a company which has no connection to Mr. Heyer or EFI.

The WinDō device and the calibration bar are milled and made for Mr. Heyer and EFI by an outside company and the testing on the calibration bar is performed by an outside agency. Mr. Heyer also explained that he has improved and changed the device over the past several years. Among other changes, he has switched from carbon steel components to all stainless steel and aluminum. In addition, he reduced the device's weight further, thereby increasing the ease with which the device can be used, by making it substantially open, rather than solid.

Mr. Heyer conceded that the Royal Bahamian inspection was the first time he used the device with a calibration bar. He further conceded that the device is proprietary, that he is the only forensic engineer he knows of who has incorporated the digital gauge into a measuring device, that the device has never been discussed in a peer-reviewed professional journal or article and that he has never before provided expert opinion testimony in depositions or trials based on results from the device. Mr. Heyer also admitted that no one else besides himself and his crew has tested the device. Nonetheless, he testified that he and his teams have used the WinDō device, instead of a level, in their engineering work for approximately the past three years, and he submitted the patent application approximately two years ago.

At bottom, the key to Mr. Heyer's device is that it is placed against the calibration bar. Basically, Mr. Heyer describes the device and his procedure as an enhanced version of tools which have been accepted by forensic engineers and the courts for many years – the tape measure and straight edge level.

Confronted with the argument that the WinDō device has never been independently tested or reviewed, Mr. Heyer testified that he would not even know what to test because the procedure is so fundamental and basic – the device is simply placed up against a calibration

6

bar.  In sum, Mr. Heyer stated at the evidentiary hearing that this is "as simple an item as I know of when it comes to tools."

Mr. Heyer explained by way of comparison that the tape measure and level combination used by forensic engineers for years has never been peer reviewed to establish its accuracy as an acceptable standard for measuring deformations.  Stripped down to its basics, Mr. Heyer's position is that the WinDō device is, to coin a phrase, a better type of mousetrap – an enhanced version of a common tool used every day by engineers.

During the evidentiary hearing, Mr. Heyer demonstrated the WinDō device, which, in my view, was a logical and understandable demonstration.  Mr. Heyer showed how the device, the calibration bar and the digital gauge worked.  Royal Bahamian's counsel cross-examined Mr. Heyer about the device and his methodology.  Although counsel certainly brought out the undeniable fact that the device has not been peer-reviewed and has not been tested in the field by engineers other than those working for Mr. Heyer, no other significant impeachment was generated.

Moreover, Mr. Heyer testified the conclusions[3] he reached about the nature, degree, and cause of damage at Royal Bahamian are able to stand *independently.*  In other words, the WinDō device enhances the opinions but is not part of the requisite foundation for his expert opinion on causation and the amount of damage.  For example, on page 4 of the report, EFI notes that the WinDō device was used "when possible" and "**assists** in assessing the potential for identifying any damage that may be the result of excessive wind loads."  (emphasis added).

II.     **Legal Standards Governing the Admissibility of Expert Testimony**

This case is about wind damage and the expert witness debate concerning an expert who has significant experience in analyzing wind damage.

---

[3]     Mr. Heyer's conclusions are outlined in an 11-page, single-spaced report which was provided to Plaintiff's counsel.  This report (DE# 80-2) concludes that "the Royal Bahamian condominiums experienced limited damage to the windows and doors as a result of winds associated with Hurricane Wilma . . . Based upon our inspection and examination of the windows and doors, we can find no evidence that they sustained damage as a result of the wind loads associated with the hurricane."

One of the fundamental considerations governing the admissibility of expert testimony is whether the expert's testimony, by virtue of his specialized knowledge or skill, will assist the trier of fact.  FED. R. EVID. 702.  As put more poetically and famously by iconic singer-songwriter-poet Bob Dylan in the *Subterranean Homesick Blues* song on his 1965 *Bringing It All Back Home* album: "you don't need a weatherman to know which way the wind blows."  Although Mr. Dylan correctly noted that an expert in meteorology might not be necessary to determine the mere direction or existence of wind, expert testimony may well be needed (or may at least be helpful) in determining whether wind deformed specific windows and doors and, if so, the amount of damage caused by such a hurricane-related wind event.

This Court's task is to determine whether Mr. Heyer is a Bob Dylan-type expert[4] whose testimony is unnecessary or incompetent or whether Mr. Heyer's proposed expert testimony can pass muster and be presented to a jury.

The admission of expert testimony is governed by Federal Rule of Evidence 702, as explained and refined by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). Under this framework, district courts are charged with a gatekeeping function "to ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002).

To fulfill its obligation under *Daubert*, a trial court engages in a three-part inquiry and considers whether: "'(1) the expert is qualified to testify competently regarding the matters he

---

[4] The Eleventh Circuit Court of Appeals sometimes refers to Bob Dylan and his 1960s vernacular in its opinions and has cited this particular Bob Dylan lyric in at least two cases. *Bass v. Board of Cnty. Comm'rs, Orange Cnty., Fla.*, 256 F.3d 1095, 1115 (11th Cir. 2001) (citing this song lyric in a Title VII case) and *United States v. Greer*, 440 F.3d 1267 (11th Cir. 2006) (citing the musician's wind-woven lyrics in a case involving a district court's refusal to impose a mandatory minimum criminal sentence under the Armed Career Criminal Act because the jury never determined whether the three prior convictions were for violent felony crimes).  Judges in other circuits are not shy about quoting the lyric about superfluous weathermen either.  *See, E.g., Latino Issues Forum v. E.P.A.*, 558 F.3d 936, 949-50, n.1 (9th Cir. 2009) (concurring opinion in a case involving a challenge to the EPA's approval of a revision to an air pollutant reduction program).

intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.'" *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-1292 (11th Cir. 2005) (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)).

Although there is inevitably some overlap among these three basic factors – qualification, reliability, and helpfulness – they are distinct concepts and should not be merged together. *See generally United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004).

The second area of inquiry referenced above requires "an exacting analysis of the proffered expert's methodology." *McCorvey*, 298 F.3d at 1257. That analysis takes into consideration a number of factors, including: (1) whether the expert's methodology can be, and has been, tested; (2) whether the expert's scientific technique has been subjected to peer review and publication; (3) whether the method employed has a known rate of error; and (4) whether the technique is generally accepted in the scientific community. *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK, Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003); *Rink*, 400 F.3d at 1292. These factors, however, are **non-exhaustive**. *Kumho Tire*, 526 U.S. at 150; *Rink*, 400 F.3d at 1292. Thus, "[i]n evaluating the reliability of an expert's method . . . a district court may properly consider whether the expert's methodology has been contrived to reach a particular result." *Rink*, 400 F.3d at 1293 n.7 (citing *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).[5]

The burden of establishing the reliability of an expert's opinions rests on the proponent of that expert's testimony. *Frazier*, 387 F.3d at 1260 (11th Cir. 2004).

As part of its gatekeeping role, the district court has "broad discretion in determining whether to admit or exclude expert testimony, and its decision will be disturbed on appeal only if it is

---

[5] Royal Bahamian does not contend that Mr. Heyer or EFI conjured up, contrived or manipulated the results of the WinDō measurements.

manifestly erroneous." *Evans v. Mathis Funeral Home*, 996 F.2d 266, 268 (11th Cir. 1993) (citing *Salem v. United States Lines Co.,* 370 U.S. 31, 35 (1962); *Polston v. Boomershine Pontiac-GMC Truck, Inc.*, 952 F.2d 1304, 1309 (11th Cir.1992)). "To warrant or permit the use of expert testimony, two conditions must be met: first, the subject matter must be closely related to a particular profession, business or science and not within the common knowledge of the average layman; second, the witness must have such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth." *Faircloth v. Lamb-Grays Harbor Co.*, 467 F.2d 685, 694 (5th Cir. 1972) (citations omitted).

### III.  LEGAL ANALYSIS

Royal Bahamian, pointing to the proprietary nature of Mr. Heyer's device, complains that it has not been peer reviewed or tested and is, for all practical purposes, an unknown procedure in the field. Mr. Heyer readily concedes that the device is proprietary but, as noted, he contends that it is a basic tool which is little more than an updated and modified version of tools which have been used for years for the same purpose.

The mere fact that the WinDō device is proprietary and unavailable for peer review does not mean that it must be excluded under the *Daubert* analysis. *A & M Records, Inc. v. Napster, Inc.*, No. C9905183MHP, C000074MHP, 2000 WL 1170106, at *5-6 (N.D. Cal. Aug. 10, 2000) (noting that publication or some other type of peer review is a pertinent consideration but further explaining that "the Supreme Court specifically noted that this factor is not dispositive of reliability" as part of its decision to not exclude the expert witness report of the CEO of Soundscan to determine the effect of online sharing of MP3 files). *Cf. R.A. Mackie & Co., L.P. v. Petrocorp Inc.*, 329 F. Supp. 2d 477, 514 (S.D. N.Y 2004) (finding testimony relevant and credible when consistent with, among other factors, proprietary valuation models).

I therefore agree with QBE and find that Mr. Heyer's expert opinion testimony satisfies the *Daubert* standard. Although the specific WinDō device is proprietary and has not been peer

tested, it is, in effect, the same type of tool which engineers have been using in the field for years to measure deformations in window and door frames. The fundamental nature of the methodology is similar to widely-accepted methodologies, such as using a level and measuring the amount of the gap with a tape measure. If anything, the device appears to be *more* accurate and reliable than the level-tape measure combination which other experts, including Mr. Heyer, use when inspecting structures for damage.

Mr. Heyer's device might be analogized to a digital thermometer which is stuck under a patient's tongue for a few seconds and which provides a specific digital readout for temperature – an update from the traditional thermometer where the reading is a sort of visual estimate after the thermometer is placed under the patient's tongue for 30 seconds.

In addition, even if I had determined that the WinDō device caused *some* of Mr. Heyer's expert opinion testimony to fail the *Daubert* examination (which I have not), this would be an insufficient ground upon which to base an order completely excluding Mr. Heyer from testifying. Because Mr. Heyer's conclusions about the building damage can stand on their own merits without the enhancement provided by the WinDō device, prohibiting Mr. Heyer from testifying would be an excessive consequence. To the extent that Mr. Heyer's device has not been evaluated by other engineers, this is an issue which Royal Bahamian may explore on cross-examination.

## IV. CONCLUSION

Royal Bahamian's *Daubert* motion to exclude Mr. Heyer from testifying at trial as an expert witness is denied, subject to the caveat that this is a preliminary ruling which can be revisited at trial with Chief Judge Moreno if the factual and legal issues develop in a significantly different way than outlined here.

DONE AND ORDERED, in Chambers, in Miami, Florida, this 21st day of October, 2010.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
The Honorable Federico A. Moreno
All counsel of record